## NATIONAL LABOR RELATIONS BOARD v. NEWARK MORNING LEDGER CO.

### No. 7556.

Circuit Court of Appeals, Third Circuit.

Feb. 3, 1941.

On Rehearing April 17, 1941.

264

CLARK, Circuit Judge, dissenting.

Lewis M. Gill and Robert B. Watts, both of Washington, D. C. (Laurence A. Knapp, Assistant Gen. Counsel, and Harry Brownstein, Attys., both of Washington, D. C., on the brief), for National Labor Relations Board, petitioner.

Charles Goldman, of New York City (Sydney Cutler and Julius Cutler, both of New York City, on the brief), for respondent.

Abraham J. Isserman, of Newark, N. J. (Isserman, Isserman & Kapelsohn, of Newark, N. J., on the brief), for American Newspaper Guild et al., amici curiae.

Before MARIS, CLARK, and GOODRICH, Circuit Judges.

MARIS, Circuit Judge.

The National Labor Relations Board has petitioned this court for a decree enforcing an order entered by it against the Newark Morning Ledger Company, publisher of a daily newspaper in Newark, New Jersey, known as the Newark Ledger. 21 N.L.R.B. No. 95. To this petition the Ledger Company has filed an answer together with a cross-petition praying that the order be reviewed and set aside. The order in question directs the Ledger Company (1) to cease and desist from discouraging its employees from membership in the American Newspaper Guild and its branches by discriminating in regard to hire, tenure or any term or condition of employment because of such membership or activity therein, or in any other manner from interfering with their right of collective bargaining, and (2) to reinstate Agnes Fahy, a discharged editorial employee, make her whole for her loss of pay, and post the usual notices of compliance.

Miss Fahy was discharged by the Ledger Company on September 22, 1937. At that time she was president of the Newark Newspaper Guild, a local branch of the American Newspaper Guild which is a labor organization of editorial department employees of newspapers. She had been very active in the Guild and although the Ledger Company strongly contends that her discharge was solely for reasons of economy and efficiency nevertheless we are satisfied that there is evidentiary support for the finding of the Board that the action was taken because of her membership in and activity on behalf of the Guild.

The Newark Newspaper Guild and the Ledger Unit of that organization had been established in 1933. In 1935 the Guild instituted negotiations with the Ledger Company for a contract. For a long time the Ledger Company refused to grant recognition to the Guild and exhibited in many ways its antagonism to that organization. Finally, however, the Ledger Company did engage in collective bargaining with the Guild. This resulted in the signing on August 12, 1937, of a contract between the company and the Guild acting on behalf of the editorial department employees of the Ledger. The contract, in addition to provisions as to wages, hours and working conditions, stipulated that "The Publisher shall not discharge or otherwise discriminate against any employe because of Guild membership or because of his activity in the Guild." This contract was in force at the time of Miss Fahy's discharge. The Board, one member dissenting, found that Miss Fahy's discharge operated to interfere with, restrain and coerce the Ledger Company employees in the exercise of the rights guaranteed by Section 7 of the National Labor Relations Act, 29 U.S.C.A. § 157, and it ordered her reinstatement and the payment of lost salary to her in order to effectuate the policies of the Act. The question presented to us is whether the function of the Board under the act had not been fully performed when the parties bargained and reached an agreement so

that they were relegated, as to breaches of the agreement, to arbitration, if provided for, or to their remedy in the courts.

■ The National Labor Relations Act in Section 1, 29 U.S.C.A. § 151, declares it "to be the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection." As the Supreme Court said in Republic Steel Corporation v. National Labor Relations Board, 311 U.S. 7, 61 S.Ct. 77, 79, 85 L.Ed. ——, the act is aimed "at encouraging the practice and procedure of collective bargaining and at protecting the exercise by workers of full freedom of association, of self-organization and of negotiating the terms and conditions of their employment or other mutual aid or protection through their freely chosen representatives." The right of employees thus to organize and bargain collectively with their employer is expressly guaranteed by Section 7 of the Act, 29 U.S.C.A. § 157. The five kinds of unfair labor practice with which alone the Board is empowered to deal are defined by Section 8, 29 U.S.C.A. § 158. The first is "To interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 [157 of this title]." The other four all relate to particular species of the generic unfair practice first defined and are specifically mentioned merely because of their prevalence. That Congress intended Section 8 to be so con-

strued is, as Judge Learned Hand pointed out in Art Metals Const. Co. v. National Labor Relations Board, 2 Cir., 110 F.2d 148, clearly shown by the legislative history of the act.[1]

■ It will thus be seen that it is the purpose of the act, by protecting employees from employer interference, intimidation and coercion, to open the way for collective bargaining on a basis of equality of bargaining power between employers and freely chosen representatives of employees to the end that voluntary agreements between them as to wages, hours and other conditions of employment will be reached and thus industrial strife and unrest will be reduced. The function of the Board under the act is to pave the way for the achievement of that final goal. When an employer who has been engaged in a labor dispute with his employees abandons his previous opposition to the labor organization which is their free choice, bargains with that organization on their behalf and enters into a genuine collective bargaining agreement with it, the goal of the act has been achieved and the Board has no further jurisdiction with respect to the labor dispute which has been settled by the agreement. The parties having bargained and agreed upon the terms and conditions of employment for a definite period of time, their rights and obligations are fixed for that time and all that remains is for them to carry out the terms of the contract upon which they have agreed.

If during the life of such a contract an employee is discharged because of union membership and activity in direct violation of the terms of the contract, the employer has violated a contractual right of the employee which the latter is entitled to have enforced. But this is a breach

---

[1] Sen.Rep. 573, 74th Cong. 1st Sess. p. 9: "In conjunction with section 7, the first unfair labor practice enumerated in section 8 makes it illegal for an employer—to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 * * * The four succeeding unfair—labor practices are designed not to impose limitations or restrictions upon the general guaranties of the first, but rather to spell out with particularity some of the practices that have been most prevalent and most troublesome."

House Rep. 1147, 74th Cong. 1st Sess. pp. 15, 17. "The first unfair labor practice in section 8, taken in conjunction with the rights stated in section 7, is merely a restatement of a portion of the language of section 7 (a) of the National Industrial Recovery Act, quoted previously in this report. * * * The succeeding unfair labor practices are intended to amplify and state more specifically certain types of interference and restraint that experience has proved require such amplification and specification. These specific practices, as enumerated in subsections (2), (3), (4), and (5), are not intended to limit in any way the interpretation of the general provisions of subsection (1)."

of a private right which may be redressed in the manner stipulated in the agreement or by recourse to the courts. The National Labor Relations Act contemplates no more than the protection of the public rights which it creates and defines. National Licorice Co. v. Labor Board, 309 U.S. 350, 366, 60 S.Ct. 569, 84 L.Ed. 799. The breach of a covenant against discharge may not be redressed by the Board because, while clearly a breach of contract, the discharge is not an unfair labor practice within the meaning of the National Labor Relations Act since it cannot possibly have the effect of interfering with, restraining, or coercing the employees in exercising a right of collective bargaining which has already been fully and successfully exercised by them. The Board is concerned only with those situations in which an employer and his organized employees have not yet reached agreement; it is no part of its duty to police the relations between an employer and his employee under a collective bargaining agreement. To construe the Act otherwise would be to impose upon the Board the Herculean task of supervising the day to day relations of employers and employees in that vast and ever growing segment of commerce and industry in which successful collective bargaining has well nigh eliminated industrial strife. If Congress had intended that the Board should assume such enormous additional responsibility it would certainly have expressly so provided. This, as we have seen, it did not do.

In the present case a long drawn out labor dispute between the Ledger Company and its employees finally terminated in the agreement of August 12, 1937. This agreement ran for the period of one year and was subsequently renewed in 1938 and 1939. It was in full force at the time of Miss Fahy's discharge. There was accordingly at that time no labor dispute in existence between the Ledger Company and its employees. Her discharge, while doubtless a violation of the agreement, was not an unfair labor practice which it was within the jurisdiction of the Board to restrain. Nor did the Board have jurisdiction to consider and restrain the unfair labor practices which had taken place prior to August 12, 1937, since those practices had been abandoned by the Ledger Company when it entered into negotiations with the Guild and signed the agreement with it. We accordingly concur in the view expressed by the dissenting member of the Board that the complaint in this case should not have been entertained by the Board.

A decree will be entered setting aside the order of the Board.

### On Rehearing.

Before BIGGS, MARIS, CLARK, JONES and GOODRICH, Circuit Judges.

MARIS, Circuit Judge.

After reargument before the court en banc and reconsideration of the question which this case raises as to the extent of the jurisdiction of the National Labor Relations Board, we have reached the conclusion that in our former opinion we placed too narrow a construction upon those provisions of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., which define the limits of the Board's jurisdiction to deal with unfair labor practices and upon those provisions of the act which define such practices. Section 10(a) of the act, 29 U.S.C.A. § 160 (a), sets out the Board's power with respect to unfair labor practices. It provides that "The Board is empowered, as hereinafter provided, to prevent any person from engaging in any unfair labor practice (listed in section 8 [158]) affecting commerce." This language takes us directly back to Section 8 for a description of the particular unfair labor practices with which alone, under the express limitation of Section 10(a), the Board is empowered to deal.

Section 8, 29 U.S.C.A. § 158, declares that: "It shall be an unfair labor practice for an employer—

"(1) To interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 [157 of this title].

"(2) To dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it * * *.

"(3) By discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization * * *.

"(4) To discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this Act [chapter].

"(5) To refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9(a) [159(a) of this title]."

■ As we pointed out in our former opinion the four practices last mentioned are but particular species of the generic unfair practice which is first mentioned in the section. Consequently we are directly referred to a consideration of the extent of the rights guaranteed by Section 7 for the answer to our question. Clearly it is only those unfair practices which interfere with, restrain or coerce employees in the exercise of those particular rights that may be dealt with by the Board.

Section 7, 29 U.S.C.A. § 157, provides that: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection." In our former opinion we took the view that the sole purpose and end of the act was to pave the way for and prevent interference with the initial exercise of the right of collective bargaining which Section 7 guarantees to employees. That right having been exercised in this case and its exercise having resulted in a collective contract between the Ledger Company and its employees regulating wages, hours and working conditions, we held that the Board had no further jurisdiction to deal with the subsequent discriminatory discharge of an employee in violation of the contract.

■ The right of collective bargaining is, however, necessarily a continuing right. Collective agreements ordinarily, as in this case, run for definitely limited periods of time. Negotiations for their renewal must take place periodically and may commence, at least preliminarily, shortly after the signing of the preceding contract. Furthermore it may at any time become desirable or indeed necessary to bargain collectively for the modification of an existing collective agreement which has proved in practice to be in some respects unfair or unworkable or for the adjustment of complaints or alleged violations of such an agreement. Collective bargaining is thus seen to be a continuing and developing process by which, as the law now recognizes, the relationship between employer and employee is to be molded and the terms and conditions of employment progressively modified along lines which are mutually satisfactory to all concerned. It is not a detached or isolated procedure which, once reflected in a written agreement, becomes a final and permanent result. Section 7, as we have seen, guarantees to employees the right to organize and engage in concerted activities for the purpose of collective bargaining. This right must necessarily continue so long as the prospect of future bargaining remains. It will thus be seen that the act guarantees to employees the continuous right to maintain labor organizations for the purpose of collective bargaining, after the signing of a particular collective bargaining agreement as well as before.

This conclusion is in harmony with the declaration of policy contained in the act. It is stated in section 1, 29 U.S.C.A. § 151, that the denial by employers of the right of employees to organize and the refusal of employers to accept the procedure of collective bargaining cause industrial strife with resulting obstruction to interstate commerce; that protection of the right of employees to organize and to bargain collectively safeguards commerce and that the policy of the act is to encourage the practice and procedure of collective bargaining and to protect the exercise by workers of full freedom of association, self-organization and designation of representatives of their own choosing.

■■ Accordingly Section 7 of the act conferred upon the employees of the Ledger Company in the case before us the right to maintain their organization, the Newark Newspaper Guild, after the signing of their agreement with their employer. The Board found, upon sufficient evidence, that Miss Fahy was discharged because of her membership in and activity on behalf of the Guild, and that this discouraged membership in the Guild. We conclude that these findings establish the existence of an unfair labor practice on the part of the Ledger Company with which the Board was empowered to deal, and that its restraining order and direction to reinstate Miss Fahy with back pay were appropriate remedies. It is settled that it is a public right created by the act which was thus enforced. In Amalgamated Utility Workers v. Consolidated Edison Co., 309 U.S. 261, 60 S.Ct. 561, 84 L.Ed. 738, Mr. Chief Justice Hughes, speaking for the Supreme Court, made this quite clear. After reviewing the procedure prescribed by the act, he said (309 U.S.

page 265, 60 S.Ct. page 563, 84 L.Ed. 738):
"So far, it is apparent that Congress has entrusted to the Board exclusively the prosecution of the proceeding by its own complaint, the conduct of the hearing, the adjudication and the granting of appropriate relief. The Board as a public agency acting in the public interest, not any private person or group, not any employee or group of employees, is chosen as the instrument to assure protection from the described unfair conduct in order to remove obstructions to interstate commerce."

Referring to the report upon the bill of the Committee on Labor of the House of Representatives (H.R.Rep. No. 972, 74th Cong. 1st Sess. p. 21) the Chief Justice said (pages 267, 268 of 309 U.S., page 564 of 60 S.Ct., 84 L.Ed. 738):

"After referring to the suitable adaptation of the Board's orders to the needs of particular cases, and especially to the power to reinstate employees with or without back pay, the Committee continued:

" 'No private right of action is contemplated. Essentially the unfair labor practices listed are matters of public concern, by their nature and consequences, present or potential; the proceeding is in the name of the Board, upon the Board's formal complaint. The form of injunctive and affirmative order is necessary to effectuate the purpose of the bill to remove obstructions to interstate commerce which are by the law declared to be detrimental to the public weal.' "

Likewise in National Licorice Co. v. National Labor Relations Board, 309 U.S. 350, page 362, 60 S.Ct. 569, page 576, 84 L.Ed. 799, Mr. Justice Stone said: "The proceeding authorized to be taken by the Board under the National Labor Relations Act is not for the adjudication of private rights. Amalgamated Utility Workers v. Consolidated Edison Co., 309 U.S. [page] 261, 60 S.Ct. 561, 84 L.Ed. [738], H. Rept. No. 1147, 74th Cong., 1st Sess. Committee on Labor, p. 24; cf. Federal Trade Commission v. Klesner, 280 U.S. 19, 50 S.Ct. 1, 74 L.Ed. 138, 68 A.L.R. 838. It has few of the indicia of a private litigation and makes no requirement for the presence in it of any private party other than the employer charged with an unfair labor practice. The Board acts in a public capacity to give effect to the declared public policy of the Act to eliminate and prevent obstructions to interstate commerce by encouraging collective bargaining and by protecting the 'exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment * * *.' § 1."

We are thus not called upon to determine whether Miss Fahy has an individual right to secure redress for her wrongful discharge or whether the law of New Jersey affords her a forum for the appropriate redress of her grievance. The existence of such a private right in Miss Fahy in no way affects the public right or the exclusive jurisdiction of the Board to enforce it. This is clear from the express provision of Section 10(a), 29 U.S.C.A. § 160(a), that the power of the Board to prevent unfair labor practices "shall be exclusive, and shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, code, law, or otherwise." A misconception of the nature of the Board's process may arise from the fact that in the enforcement of the public right to have the channels of interstate commerce freed from obstructions resulting from unfair labor practices a private right of an employee may incidentally be protected or enforced. Even though private relief is thus afforded it nevertheless remains true that the Board's powers may be invoked only when there is a public right to be protected and that its processes are never available to a private suitor.

It is apparent that the jurisdiction of the Board to prevent unfair labor practices is very broad. It is, we think, equally clear that the exercise of this jurisdiction in any particular case, is, under the language of Section 10, discretionary with the Board. The jurisdiction is not to be exercised unless in the opinion of the Board the unfair labor practice complained of interferes so substantially with the public rights created by Section 7 as to require its restraint in the public interest. As we have seen, the mere fact that a private right of an employee has been infringed by the act of an employer is not of itself sufficient to bring the Board's powers into play. The Congress, has, however, reposed in the Board complete discretionary power to determine in each case whether the public interest requires it to act. With the appro-

priate exercise of that discretion we may not interfere.

■ The scope of the Board's order remains for consideration. The Board, as we have seen, found that the Ledger Company, in discharging Miss Fahy because of her Guild activity, had discriminated in regard to tenure of employment and thus discouraged membership in the Guild in violation of Section 8(3). It accordingly ordered the Company to cease and desist from discouraging membership in the Guild or in any other labor organization of its employees by such discrimination and further ordered Miss Fahy's reinstatement with back pay. So much of its order was clearly warranted. However, the Board went further. It found "that by said discrimination the respondent interfered with, restrained, and coerced its employees in the exercise of the rights guaranteed in Section 7 of the Act," and it ordered the Company by paragraph 1 (b) of its order to cease and desist from "In any other manner interfering with, restraining, or coercing its employees in the exercise of their rights to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection, as guaranteed in Section 7 of the Act."

■ Upon the sole basis of the finding of an isolated act involving the discharge of a single employee the Board has entered a blanket order restraining the Ledger Company from hereafter committing any act in violation of the statute however unrelated it may be to the one act found to have been previously committed. The Company is thus, for example, enjoined, under pain of punishment for contempt, from dominating or contributing support to a labor organization in violation of Section 8 (2) although there is no evidence that it has ever heretofore done so; it is likewise enjoined from refusing to bargain collectively with the representatives of its employees in violation of Section 8(5), although the evidence shows that it has actually entered into a freely negotiated collective agreement with the Guild as the representative of its employees and that this agreement has been twice renewed. It is, however, now settled that in the absence of a finding that the unfair labor practices actually engaged in by an employer have been so persistent and varied as to justify the apprehension of continued similar and varied efforts in the future to interfere with the employees' right of self-organization and collective bargaining, the entry of a blanket order to cease and desist from all violations of the act is not justified. National Labor Relations Board v. Express Publishing Co., 61 S.Ct. 693, 85 L.Ed. ——.

■ In the present case the Board made no such finding nor was there evidence upon which such a finding could have been made. Accordingly we conclude that the Board erred in including in its order the blanket provisions of paragraph 1 (b). That paragraph will therefore be stricken out. Likewise the portion of paragraph 2 (b) which directs the Company to reimburse public work relief agencies for monies paid Miss Fahy for work performed by her for them must be stricken out. Republic Steel Corp. v. National Labor Relations Board, 311 U. S. 7, 61 S.Ct. 77, 85 L.Ed. ——. Finally, the provision of the Board's order for the posting of notice will be amended to conform to the Board's present practice.

The order of the National Labor Relations Board will be modified to the extent indicated in this opinion. A decree enforcing it as so modified will be entered.

CLARK, Circuit Judge (dissenting).

I see no reason to change the view indicated by my vote for the original decision of this Court. [1] It, therefore, behooves me now to clothe that judicial act in, I hope, appropriate, and mayhap even convincing, language. In doing so, let me first emphasize the exact nature of the question in litigation. In my opinion, a failure to properly allot emphasis thereon may have led to my colleagues' change of mind.

We are concerned, and solely concerned, with an additional tribunal. The matter is not one of an employee's right, but of the forum for her remedy. There has been a discharge and in the view both of the Board and of the writer, an improper discharge. Its cause is of no moment. It may have been, as the Board found, the too familiar discriminatory discharge for union activities, or it may have been because the newspaper made an unfair estimate of her "sweet reasonableness" or, again, it may have been simply because the managing editor did not appreciate her taste in millinery. In any

---

[1] Filed February 3, 1941.

event, the employee qua employee had already become a party to a contract designed especially for her protection. This contract is a collective bargaining agreement. It was entered into, it is true, as a consequence of the events of which the employee here complains. That circumstance in no way affects the puissance of the agreement however. It is in the form used generally by the American Newspaper Guild and contains clauses fully covering the dispute now in issue.[2] The employee presented her grievances to that committee. She found their response unsympathetic, the voting being ten to two against her.[3] She contends that this vote is tainted with the very vice of the original proceeding. Even if this is so, it is quite irrelevant. She is still a party to a contract. In her suit for the enforcement thereof she may meet any defense based on the unfavorable vote of the Guild's committee by a rejoinder embodying her theory of its inspiration.

That any individual employee can obtain redress for the breach of a collective bargaining agreement is no longer an open question. I say "no longer" because earlier courts accompanied their, shall we say rigid, attitude toward the working man or woman generally, by a specific hostility to his rights under a collective labor agreement.[4] But modern judges, despite the divergence of theories adopted, will enforce these agreements at the instance of employer, employee, or union.[5] Nor will specific enforcement

---

[2] "Article IV. Discharge

"1. The Publisher shall not discharge or otherwise discriminate against any employe because of Guild membership or because of his activity in the Guild.

"2. Upon dismissal for any cause other than wilfull gross misconduct, the Publisher shall pay any employe as a dismissal indemnity a sum of money varying with his length of service, according to the following schedule: * * *

"Article VII. Standing Committee

"1. The Guild shall designate a committee of its own choosing to take up with the Publisher or his authorized agent any matter arising from the application of this agreement. * * *" Agreement, August 12, 1937, Respondent's Exhibit No. 10, Appendix to Respondent's Brief, p. 147.

[3] Appendix to Respondent's Brief, p. 177.

[4] On the enforceability of collective bargaining agreements see Witmer, Collective Labor Agreements in the Courts, 48 Yale Law Journal 194; Fuchs, Collective Labor Agreements In American Law, 10 St. Louis Law Review 1; Johnson, An Analysis of the Present Legal Status of the Collective Bargaining Agreement, 10 Notre Dame Lawyer 413; Rice, Collective Bargaining Agreements in American Law, 44 Harvard Law Review 572; Christenson, Legally Enforceable Interests in American Labor Union Agreements, 9 Indiana Law Journal 69; Pipin, Enforcement of Rights Under Collective Bargaining Agreements, 6 University of Chicago Law Review 651; Hamilton, Industrial Rights Arising From Collective Labor Contracts, 3 Missouri Law Review 252; Anderson, Collective Bargaining Agreements, 15 Oregon Law Review 229; Agger, Contracts—Collective Bargaining Agreements—Rights of Unions and Individuals, 18 Marquette Law Review 251; Theories of Enforcement of Collective Labor Agreements, 41 Yale Law Journal 1221 (comment); Collective Labor Agreements, 31 Columbia Law Review 1156 (note); Contracts — Collective Labor Agreements—Right of Nonunion Employee, 23 Washington University Law Quarterly 570; Labor Law—Employee's Rights Under Union-Employer Agreements, 10 North Carolina Law Review 394 (note); Labor Law—Collective Labor Agreement Violated by Employer—Action for Damages by Non-Member of Union, 26 Illinois Law Review 922 (note); Labor Law—Nature, Validity and Enforcement of Collective Bargaining Agreements, 11 New York University Law Quarterly Review 262 (note); Labor Law—Contracts—Rights of Employee Under Collective Agreement, 2 University of Chicago 335; The Present Status of Collective Labor Agreements, 51 Harvard Law Review 520 (note); Contracts—Contracts for Benefit of Third Party—Trade Unions—Right of Non-Member to Sue Employer for Damages Resulting from Breach of Contract With Union, 16 Minnesota Law Review 100 (note). Cf. Deguit, Collective Acts As Distinguished from Contracts, 27 Yale Law Journal 753, 766. For a survey of effect given to these agreements in other countries see Mackintosh, Legislation Concerning Labour Agreements, 14 Canadian Bar Review 97 and 220; Rice, Collective Bargaining Agreements in American Law, 44 Harvard Law Review 572, 575.

[5] See articles cited in footnote 4. Also 1 Teller, Labor Disputes and Collective Bargaining §§ 163, 166.

"That the employment under a craft agreement is one at will, or that such agreement may be changed at any future time, is no bar to relief. So long as the

be barred by the ancient and now considerably weakened "slavery" doctrine.[6] Whatever the effect given to individual employment contracts, collective agreements are held to be in a special category. So where money damages are inadequate, equity will enforce their terms.

We can assume, then, that the discharged employee here may, if she establishes her facts, get either damages, if she is money-minded, or her job back. We can further assume that this may be done with the assistance of those courts ordained to help all of her fellow-citizens and not only those working within the nebulous conception of interstate commerce. With this right and with these courts neither the employee in the case at bar, nor the National Labor Relations Board in her behalf, are satisfied. They do not, naturally, criticize courts that have existed for centuries prior to their own existence. They merely express a preference for and insist upon initial administrative remedies. One has to say initial because for enforcement they find themselves in these very same courts.[7] Nor is the writer in his turn critical of the theory and practice of quasi-judicial bodies. He had occasion to give it some consideration in another dissenting opinion recently filed.[8] Some prefer them, others disparage them.[9]

The trouble with that preference and insistence lies in its being but another instance of the wishful thinking by which we strive to make so much of life tolerable. The Congress may, and frequently has, assigned what it deemed appropriate subject matter to administrative tribunals for preliminary decision. Many such instances are listed in the dissenting opinion just referred to. These tribunals may be exclusive, such as the Interstate Commerce Commission and the Federal Communications Commission, or they may be concurrent, as in the instances of the Board of Tax Appeals, the Federal Trade Commission, and in the contention of the principal case. The majority concede, as they must, that any such legislative assignment is by implication only and in the spirit rather than in the letter of the law. Their argument may be paraphrased thus. Collective bargaining is, by definition, the fundamental device of labor unionism. Discharging its members in sufficient quantities will destroy any union. Ergo the Labor Board should have jurisdiction to prevent such discharges. The non sequitur seems plain to the writer. Destruction by unredressed discharge is inevitable. Destruction because the redress is in one form and not another, is inconsistent with the meaning of the word. If the remedy is there, a labor union is impervious. This is so whether the remedial process starts in a hearing room in Washington or in a court room in New Jersey and

employee continues to work and the craft agreement is in effect, he is entitled to his rights under the contract." Pipin, Enforcement of Rights Under Collective Bargaining Agreements, 6 University of Chicago Law Review 651, 653.

6 See Gregg v. Starks, 188 Ky. 834, 224 S.W. 459; Piercy v. Louisville & N. Ry., 198 Ky. 477, 248 S.W. 1042, 33 A.L.R. 322; McGregor v. Louisville & N. Ry., 244 Ky. 696, 51 S.W.2d 953.

"If the union has not the right to invoke the aid of a court of equity to prevent the unlawful violation of a contract such as exists in the case at bar, then such a contract loses most of its force, and the rights of collective bargaining are narrowed, and the economic benefits to the community from collective bargaining to a great extent lost." Goldman v. Cohen, 222 App.Div. 631, 634, 227 N.Y.S. 311, 314.

See also Witmer, Collective Labor Agreements in the Courts, 48 Yale Law Journal 194, 204 et seq.; Rice, Collective Bargaining Agreements In American Law, 44 Harvard Law Review 572, 607; Simpson, Fifty Years of American Equity, 50 Harvard Law Review 171, 200–201; Equity: Specific Performance of Collective Bargaining Contract At the Suit of a Trade Union, 16 Cornell Law Quarterly 96 (note); Collective Bargaining Agreements: The Seniority Clause, 41 Columbia Law Review 304 (comment). Cf. Mason, Organized Labor as Party Plaintiff in Injunction Cases, 30 Columbia Law Review 466.

"The agreements into which this bargaining crystallizes must be adequately enforced by the courts not only to give effect to the intent of the parties and insure fair dealing between them, but also to avoid the inevitable alternative to judicial sanction, strikes and lockouts, costly alike to employer, employee, and consumer." Theories of Enforcement of Collective Labor Agreements, 41 Yale Law Journal 1221, 1222 (comment).

7 29 U.S.C.A. § 160(e).

8 Burk Brothers v. N. L. R. B., 3 Cir., 117 F.2d 686, filed February 3, 1941.

9 Final Report of the Attorney General's Committee on Administrative Procedure, United States Government Printing Office, 1941.

whether the hearers wear black robes or business suits.

There seems to me something patronizing in this particular effort to help out the Congress. That body has shown no sign of failing to comprehend the distinction between a statute which creates the new right of bargaining by "representatives of one's own choosing" and a statute which affords a new and additional tribunal for the primary adjudication of one of the oldest rights known to the common law—the rights under a contract. So in the Railway Labor Act, the Congress declared: "The disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions, including cases pending and unadjusted on June 21, 1934, shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board with a full statement of the facts and all supporting data bearing upon the disputes." 45 U.S.C.A. § 153(i). [10]

Other legislative bodies, both in this country [11] and abroad, [12] have been equally specific. On the other hand, in New York, where the State Labor Board has a grant of power comparable to the National Labor Board, [13] the court has held that the Board "was not given any power * * * to interpret, enforce or abrogate any contract made by any two parties, particularly where it [the Board] is not a party to the contract." [14]

[10] Chamberlain, The Railway Labor Act, 12 American Bar Association Journal 633; Ellengwood, The Railway Labor Act of 1926, 36 Journal of Political Economy 53; Gause & Kightlinger, The Railway Labor Act Decision, 12 Indiana Law Journal 403; Garrison, The National Railroad Adjustment Board: A Unique Administrative Agency, 46 Yale Law Journal 567; Magruder, A Half Century of Legal Influence Upon the Development of Collective Bargaining, 50 Harvard Law Review 1071, 1086 et seq.; Mayper, Industrial Arbitration, 1 Arbitration Journal 322; Railroad Labor Legislation of 1934, 29 Illinois Law Review 789 (note).

[11] Minnesota Acts of 1939, c. 440, §§ 2, 8, 9, 11 (a) and 12 (a); Wisconsin Acts of 1939, c. 57, § 111.06 (2c), 111.06 (1F), 111.10, 111.11. Compare, 2 Teller, Labor Disputes and Collective Bargaining § 451; Rice, Wisconsin Labor Relations Act in 1937; 1938 Wisconsin Law Review 229; The State Labor Relations Acts, 51 Harvard Law Review 722 (note).

[12] Great Britain: Sells, The Settlement of Industrial Disputes in Great Britain, 5 Law & Contemporary Problems 321. Australia: Evatt, Control of Labor Relations in the Commonwealth of Australia, 6 University of Chicago Law Review 529; Russell, The Commonwealth Conciliation and Arbitration Act, 1928, 2 Australia Law Journal 147. Canada: Mackintosh, Government, Intervention in Labour Disputes in Canada (1924); Fisher, Industrial Disputes and Federal Legislation, pp. 139–148; Nicholls, Mediation, Conciliation and Arbitration of Labor Disputes in Canada, 2 Arbitration Journal 375. Sweden: Childs, This is Democracy; Robbins & Heckscher, Collective Bargaining in Sweden, 24 American Bar Association Journal 926; United States Department of Labor, Report of Comm'n on Industrial Relations in Sweden (1938); Hagander, The Swedish Labor Court, 1 Arbitration Journal 411; Robbins, Jurisdiction of the Labor Court in Sweden, 35 Illinois Law Review 396. Philippine Islands: Compulsory Industrial Arbitration in the Philippines, 2 Arbitration Journal 29. France: Sobernheim & Rothschild, Regulation of Labor Unions and Labor Disputes in France, 37 Michigan Law Review 1025; Riesenfeld, Recent Developments of French Labor Law, 23 Minnesota Law Review 407. Germany: Lehmann, Collective Labor Laws Under the German Republic, 10 Wisconsin Law Review 324. Compare, Mitchell, Industrial Relation Laws of Great Britain, Canada, Australia, and New Zealand, 22 Minnesota Law Review 921; Malick, Labor Studies Under Democracy (University of Colorado Studies, Series C., Studies in the Social Sciences Vol. 1, No. 1).

[13] "The New York State Labor Relations Act (Laws of 1937, Chapter 443, effective July 1, 1937; Article 20 of the Labor Law, Consol.Laws, c. 31, § 700 et seq.) * * * provides a complete supervision of labor relations for employers in intrastate enterprises similar to that set up by the National Labor Relations Act with respect to interstate or foreign commerce. The state act, with added details, follows closely the national act." Consolidated Edison Co. v. Labor Board, 305 U. S. 197, 222, 223, 59 S.Ct. 206, 214, 83 L. Ed. 126.

[14] United Baking Co., Inc. v. Bakery & Confectionery Workers' Union, etc., 257 App.Div. 501, 14 N.Y.S.2d 74, 80.

A common form of legislative construction of statutes is to be found in the prior and subsequent proceedings of the legislative body whose handiwork is to be interpreted. The proceedings anent the National Labor Relations Act leave no room for doubt. A leading authority on labor problems and industrial relations, Professor Wolf, and the writer of a note in the Harvard Law Review have observed:

"The first step in making collective bargaining agreements *legally enforceable* would be to declare that a violation of the agreement, or of any of its terms, by either party thereto would constitute an unfair labor practice. This could be done by simply adding a paragraph to that effect to Section 8 of the National Labor Relations Act. A violation, or a threatened violation would then set the machinery of enforcement in operation upon appeal by either party.

"Such machinery might well consist of, first a federal agency comparable to the National Labor Relations Board. Unless the additional duties arising out of the *enforceability of agreements* would place too great a burden on an already overworked and understaffed body, there is much to be said for making the Board itself the superstructure of the machinery here contemplated." Wolf, The Enforcement of Collective Labor Agreements: A Proposal, 5 Law & Contemporary Problems 273, 282 (italics ours).

"It should be borne in mind that the Wagner Act was predicated upon the assumption that collective agreements were adequately protected by existing judicial remedies. *Administrative enforcement* of these agreements, although a reasonable *possibility*, is not yet receiving serious consideration by the present Congress." The Proposed Amendments to the Wagner Act, 52 Harvard Law Review 970, footnote 29, 973 (note) (1939) (italics ours).

In the Hearings on the National Labor Relations Board before the Committee on Education and Labor of the United States Senate in the spring of 1935, we find that Mr. William H. Davis [15] submitted on behalf of the Twentieth Century Fund, Inc., the following finding and recommendation:

"We think it is desirable that such agreements, freely arrived at between employers and their employees, should, if the parties to the agreement so desire, and after registration by an appropriate governmental agency, be sanctioned by giving to such agency appropriate *power to enforce* the agreements. * * *

"We recommend that the act provide for a Federal Labor Commission, a permanent and independent governmental agency whose members shall be appointed by the President with the advice and consent of the Senate, and which shall have the following functions * * * the *power* under appropriate rules and regulations to register, at the joint request of the parties, and to *enforce* trade agreements of definite duration freely entered into by employers and their employees." Hearings on S. 1958, Part. 3, pp. 720-721 (italics ours).

This recommendation did not, however, find its way into the Act. Furthermore, although various members of the Congress seemed to have been dissatisfied with one or another of the provisions of the statute as finally enacted, such displeasure did not take the form of repeating by way of amendment proposals anything like those offered by Mr. Davis.[16] The conclusion seems irresistible that, in the first place, Congress frowned upon the Twentieth Century Fund's theory of power for the Board and, in the second place, that nothing subsequently transpired to change the frown into a smile.

Analogous in principle and in operation to legislative construction is executive construction. The writer has never favored the extreme views of this doctrine held by some courts.[17] However, he has felt it should be used as a marker rather than as a channel or, in a different metaphor, as a wise precedent rather than as a binding authority. Although the judicial notice available to me indicates no other instance of redress by a Labor Board after a collective bargaining agreement, my information is, of course, geographically limited.

---

[15] Now, interestingly enough, Chairman of the Defense Mediation Board and then Chairman of a Special Committee on the Government and Labor of the Twentieth Century Fund, Inc., New York.

[16] Report of the National Labor Relations Board to the Senate Committee on Education and Labor Upon S. 1000, S.

1264, S. 1392, S. 1550, and S. 1580, April 1939 (included in Hearings Before the Senate on the above bills. Part 3, p. 467).

[17] Commissioner v. Textile Mills Securities Corp., 3 Cir., 117 F.2d 62, 72. Cf. Feller, Addendum to the Regulations Problem, 54 Harvard Law Review 1311, 1319.

Therefore, a departmental or administrative practice in the technical sense cannot be relied on. It does seem proper, nevertheless, to submit the following quotations in their capacity as markers and wise precedents.

### Members of the Board

"All that the Act intends to accomplish in regard to collective bargaining is to see that the employer may not by tactics of obstruction and bad faith so conduct himself as to make negotiations impossible and thereby defeat the consummation of an agreement." Edwin S. Smith.[18]

"Yes; I think so, but that answer does not mean that it is applicable in exactly the same way, and I was just going to remark in connection with Senator Burke's question about the mediation provision of the Railway Labor Act, that the question has often been asked me why has that not applied to the other industries? My answer usually is this: The Labor Relations Act proceeds on the theory of the novel writer. It says that the employer shall not discriminate against organizations or interfere with them, and then it says employers shall not refuse to bargain collectively. That is where the authority of the Labor Relations Board ends, at bringing the employer and employee together, but negatively. The moment the employer does not refuse to bargain collectively, the Board is through. In other words, it is like the novel, when the hero and heroine get together they live happily ever after. Well, anyone who is married knows that is not all the story. The Railway Labor Act starts where the Labor Relations Act leaves off with the provision protecting the rights of employees. The Railway Act starts just the other way, positively. It says it shall be the duty of every carrier and his officers and agents and of all the employees to exert every effort to make and maintain agreements. That is collective-bargaining agreements. It is their duty to do that, to exert every effort to do it. Instead of stating it negatively, they shall not refuse to bargain, it says they shall bargain, and then it provides that every one of those agreements shall be filed with the National Mediation Board." William M. Leiserson. [19]

### Counsel for the Board (or its predecessors)

"The National Railroad Adjustment Board, created in 1934 by amendment to the Railway Labor Act of 1926, is, so far as I know, the only *administrative* tribunal, federal or state, which has ever been set up in this country for the purpose of rendering *judicially enforceable* decisions in controversies arising out of the interpretation of contracts." Lloyd K. Garrison [20] (italics ours).

"A signed contract is then the end—all of the process, so far as the National Labor Relations Act is concerned; for regarding the *observance of contracts* the National Labor Relations Board, to which the act entrusts the application of its standards, has *no responsibility*. It is 'the practice and procedure of collective bargaining' that is the board's concern. The formation of the contract is the culmination of collective bargaining. At that point the legislative process in labor relations is over, and the executive process of application and interpretation begins." William G. Rice [21] (italics ours).

"The Act does not deal with the *enforcement of agreements* at all, either against the employer, or against the employee. It leaves the law on this matter where it stood before." Calvert Magruder [22] (italics ours).

"It is perfectly true, and there has never been any doubt about it, that the law does deal with the somewhat limited field of labor relations, that is, it is not a mediation board or an arbitration board, or a conciliation agency. It was set up to protect, under the terms of the statute, certain rights, which were very simply stated, that is, the right of collective bargaining, and as an incident thereto, the right of self-organization.

"Now, that is all that the function of the Board is." Charles Fahy. [23]

---

[18] Hearings Before the Committee on Education and Labor, U. S. Senate, 76th Cong., 1st Sess., on S. 1000, S. 1264, S. 1392, S. 1550, S. 1580, and S. 2123, Bills to Amend the National Labor Relations Act, p. 1607.

[19] Hearings, supra, p. 998.

[20] Garrison, The National Railroad Adjustment Board: A Unique Administrative Agency, 46 Yale Law Journal 567.

[21] Rice, The Legal Significance of Labor Contracts Under the National Labor Relations Act, 37 Michigan Law Review 693–694.

[22] Magruder, A Half Century of Legal Influence Upon the Development of Collective Bargaining, 50 Harvard Law Review 1071, 1112.

[23] Hearings, supra, pp. 444–445.

At the second argument learned counsel for the Board rather intimated that our first decision had been due to an oversight. He suggested that we had been unconscious of the last phrase of Section 157 which reads " * * * for the purpose of collective bargaining or other mutual aid or protection".[24] That a court whose frequent duty it is to enforce the Act generally, should be unaware of any of its provisions seems unlikely. However, we did not overlook the quoted words. We thought then and from the majority opinion it appears to be the only thing on which we agree now, that the phrase has absolutely "nothing to do with the case". They derive via the famous Section 7(a) of the National Industrial Recovery Act[25] and from the preamble of Section 2 of the Norris-LaGuardia Act.[26] Frankfurter and Greene, in discussing that preamble, have this to say:

"This pronouncement recognizes the futility of freedom *of* contract in the absence of the freedom *to* contract. That a single enterprise may, and increasingly does, control the opportunity for the employment of thousands, and that through cooperative tactics of these large units the practical dominance of a whole industry may be achieved—these are facts of our economic life which form the major premise of the proposed legislation.

"As formula, this expression of policy is far from novel. Many courts, including the Supreme Court itself, have repeatedly given it judicial benediction. The need for legislative assertion arises, as we have seen, from the fact that in action the courts have honored this policy more in the breach than in the observance. The new legislative exordium is doubtless also susceptible of judicial evaporation. But in its setting the section is *useful rhetoric*. It is intended as an explicit avowal of the considerations moving Congresssional action and, therefore, controlling any loyal application of national policy by the courts." Frankfurter and Greene, The Labor Injunction, pp. 211-212 (italics in second paragraph ours).

It seems hardly necessary to point out that the "useful rhetoric" is used in a statute that does not concern itself in any way with a Labor Board and can scarcely, therefore, have much to do with conferring power thereon. If this were not enough, I may also observe that the shop-worn rule of ejusdem generis applies here, as elsewhere.[27] A writer in the Yale Law Journal applies it specifically. He says: " * * * A second reading reveals, however, that the Section protects in the line of union activities only *organizational* and *defensive* activities—concerted activities 'for mutual aid or protection'. The word 'protection' should be enough to establish this, but the conclusion is reinforced by use of the word 'other', which refers back to 'collective bargaining'. By familiar principles of statutory construction, therefore, 'other' limits what follows to activities of the same general nature as collective bargaining." Ward, "Discrimination" Under the National Labor Relations Act, 48 Yale Law Journal 1152, 1161.

If this language goes beyond a "rhetoric" meaning, it is possibly found in the views of a Congressional opponent of the original Act. He says: "Under rights of employees it is provided that they may engage in concerted activities for mutual aid—and this is not restricted to an employer's own employees but labor agitators from anywhere may thrust themselves into a man's business and interfere with his employees and try to get them dissatisfied and demand that they unionize against their will." 79 Cong. Rec., Pt. 9, p. 9701, 74th Cong., 1st Sess.

The writer of this dissent ends where he began. The case presents no issue of labor's rights or relations. This country's policy has favored the negotiation rather than the compulsion of agreements.[28] A wise Congress has, by the Wagner Act, freed that negotiation from the unfairness which may arise from the difference in economic position of the bargaining parties. To assign their enforcement to the same agency that protects their formation is a step toward

---

[24] 29 U.S.C.A. § 157.

[25] 48 Stat. 195, declared unconstitutional in Schechter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L. Ed. 1570, 97 A.L.R. 947.

[26] 47 Stat. 70, 29 U.S.C.A. § 102.

[27] Texas v. United States, 292 U.S. 522, 54 S.Ct. 819, 78 L.Ed. 1402.

[28] For an unsuccessful state attempt at compulsory industrial arbitration see Wolff Packing Co. v. Court of Industrial Relations, 262 U.S. 522, 43 S.Ct. 630, 67 L.Ed. 1103, 27 A.L.R. 1280; Id., 267 U. S. 552, 45 S.Ct. 441, 69 L.Ed. 785; Bowers, Kansas Court of Industrial Relations; Fisher, Industrial Disputes and Federal Legislation, pp. 249–251.

the compulsion we have so far eschewed. It is clearly no far cry from fostering agreements to wanting to say what should be in them. The courts coming fresh to an already existing contract are free from that temptation. On the other hand, the administrative process has the advantages of flexibility and familiarity. The choice should be made by direct, and not by judicial, legislation.