# NATIONAL LABOR RELATIONS BOARD v. WALT DISNEY PRODUCTIONS.

## No. 10603.

Circuit Court of Appeals, Ninth Circuit.

Dec. 5, 1944.

Rehearing Denied Jan. 11, 1945.

Alvin J. Rockwell, Gen. Counsel, N.L.R.B., Malcolm F. Halliday, Associate Gen. Counsel, and David Findling and Charles Ryan, Attys., N.L.R.B., all of Washington, D.C., for petitioner.

Gunther R. Lessing, O'Melveney & Myers, and Jackson W. Chance, all of Los Angeles, Cal., for respondent.

Before GARRECHT, STEPHENS, and HEALY, Circuit Judges.

STEPHENS, Circuit Judge.

The National Labor Relations Board petitions for the enforcement of its order directed against respondent Walt Disney Productions, a California corporation and a producer and mover into interstate commerce of motion picture sound cartoons.

The Board issued a complaint against respondent alleging unfair labor practices within the meaning of § 8(1) and (3) of

the National Labor Relations Act, 29 U.S. C.A. § 158(1) and (3),[1] on the ground that respondent through its officers, agents and attorney had pursued a critical course toward unions within the hearing and with the knowledge of its employees and had on November 24, 1941, discharged Arthur Babbitt, one of its cartoon animators, for engaging in union activities. Babbitt was a member of Screen Cartoonists Local 852, affiliated with the American Federation of Labor's Brotherhood of Painters, Decorators, and Paperhangers of America, herein called the Union.

The Board ordered respondent to cease and desist (1) from discouraging membership in the Union or other labor organization by discriminating in regard to any condition of employment and (2) from interfering with its employees in the exercise of rights guaranteed by § 7 of the Act, 29 U.S.C.A. § 157. The Board also ordered respondent to reinstate Babbitt upon his application within forty days after his discharge from the armed forces of the United States, to make him whole for the loss of back pay from the time of his discharge until the time of his reinstatement excluding the period of his service in the armed forces, and to post appropriate notices.

The Board's finding that Arthur Babbitt was discriminatorily discharged is claimed by respondent to be without substantial evidential support.

The evidence shows that Babbitt was an expert animator, that he had worked for respondent for approximately nine years at a continually increasing salary until eventually in 1941 only six of respondent's thirty-one animators were receiving salaries equal to or greater than his, that he was listed in one of the two highest groups under the studio salary classification plan, that his work generally received a high studio rating, that he was considered by experts as one of the top animators in the industry.

When a company union was proposed in 1937, Babbitt took an interest in its organization and was elected its first president. However, it became inactive when respondent refused to enter into a collective bargaining agreement with it. On two occasions Babbitt verbally disapproved the efforts of management to block other unions by favoring the company union. The latter was disestablished in 1941 following the filing of charges by the Union involved herein.

Babbitt joined the Union in 1941 and publicly advocated that others should join. He testified to various strongly anti-union statements by Walt Disney, by respondent's lawyer, and by respondent's casting director. Walt Disney is respondent's president and head of production.

In the spring of 1941 respondent found necessary the curtailment of production and the reduction of personnel because war conditions had adversely affected its foreign market. As a result, twenty-four employees, seventeen of them Union members, were released in May. Respondent refused to discuss its action with the Union, and a strike was proposed. Immediately, respondent dismissed union-chairman Babbitt, explaining in a letter from respondent's attorney that Babbitt had "on numerous occasions engaged in union activities of various kinds and descriptions on the Company's property and on the Company's time," despite repeated warnings, in violation of a rule against such practices. A strike, under the direction of Babbitt, by four hundred of respondent's eleven hundred employees began and continued for nine weeks. Finally, the Union and respondent agreed to arbitrate their differences, the strike ended, and all dismissed union employees were reinstated.

The arbitration proceedings resulted in an award settling a contract between Union and respondent. A method for dismissing employees was agreed upon with a provision for a closed shop and a grievance and arbitration procedure for all disputes included. The arbitration award specially referred to Babbitt, recommended his re-

---

[1] 29 U.S.C.A. § 158: "It shall be an unfair labor practice for an employer—

"(1) To interfere with, restrain, or coerce employees in the exercise of rights guaranteed in section 157 of this title."

[§ 157: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection."]

"(3) By discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization * * *."

instatement, and decreed that he was not to be "subject to discharge incident to reorganization except for cause."

Almost immediately after the effective date of the contract, a list of employees to be laid off in order to accomplish the impending reduction in personnel was prepared by respondent, disapproved by the Union, and submitted to arbitration according to plan. In the meantime the studio was closed. A new list was drawn up by respondent and agreed to by the Union. The studio reopened, and the employees to be retained returned to work. Babbitt, though retained as an animator, testified that thereafter he was assigned a less comfortable office, less complete equipment and less important work than previously, and that he was given no work at all after November 15 although all the other animators had assignments during this period.

A further decrease in personnel being necessary because of curtailed production, casting director Harold Adelquist selected certain employees to be released as of November 24, 1941, and checked with various directors as to the wisdom of his choice. The resulting list was approved in toto by Walt Disney, and a copy was submitted to the Union. Babbitt was one of the six animators whose names appeared on the list for discharge. It may be noted that he outranked the other five in work rating, salary, and seniority, and similarly that he outranked many others who were retained in employment. All complaints arising out of the layoffs, with the exception of Babbitt's, were settled through the grievance procedure of the labor contract. Babbitt's case was handled separately because of the provision in the arbitrators' award of August 2, 1941, referring specially to him.

Although the testimony herein is susceptible of varying interpretations, evidence in support of the Board's findings is substantial to the effect "that Adelquist purposely avoided assigning work to Babbitt * * * while the real reason was his [Babbitt's] Union leadership and activity before and during the strike," "that the respondent had no intention of re-employing Babbitt, after November 24, 1941, and that the alleged layoff was, in fact, a discharge," and therefore "that the respondent, by discharging Arthur Babbitt on November 24, 1941, has discriminated in regard to his hire and tenure of employment."

Reference to the function of this court in its consideration of enforcement petitions is made in our recent opinion of National Labor Relations Board v. Idaho Refining Co., 9 Cir., 1944, 143 F.2d 246, 247: "This case presents the situation, not unusual in Board order enforcement cases, in which the employer earnestly believes in his case, and asks us to consider the evidence as a whole and decide that it does not support the findings of the Board. The employer is remotely aware of the fact that we cannot weigh the evidence and that our only function is to decide whether or not the Board has acted within the law, including, as this function does, the decision as to whether there is any supporting evidence for the findings. Section 10(e) of the Act, 29 U.S.C.A. § 160(e): 'The findings of the Board as to the facts, if supported by evidence, shall be conclusive.' The employer, however, argues that all of the evidence put together produces a whole which, reasonably viewed, does not show unfair labor practices. Usually he means that the evidence does not show intention to be unfair, but he understands the word 'unfair' in its common meaning and not in its meaning as defined in the labor act. * *" The comment is particularly appropriate to the instant case in view of the detailed argument of respondent herein that, relating the different items of evidence to an over-all viewpoint, there is clearly no substantial evidence to support the Board's finding and conclusion of discriminatory discharge. We do not suggest that in rare cases seemingly reasonable inferences drawable from detached items of evidence may not prove to be wholly untenable from the over-all viewpoint. After a very careful review of all of the evidence in this case with respondent's argument and the above set out principles in mind, we are unable to agree that the Board's findings, excepting those supporting parts of the order which we refuse to order enforced, are without support in the evidence.

Because respondent's collective bargaining agreement with Union contains a grievance and arbitration procedure for the settlement of disputes, respondent contends that the unfair labor practice alleged, namely the dischage of Babbitt for his union activities, could not affect interstate commerce and therefore that the Board had

no jurisdiction over the proceeding. According to respondent's theory the collective bargaining agreement provides a peaceable means of settling labor disputes; the tranquil disposition of such disputes negatives the possibility of burdening or obstructing interstate commerce; therefore there exists no unfair labor practice over which the Board has jurisdiction under the Act. The Board found the contention without merit.

The basic purpose of the Act is to free interstate commerce of obstructions resulting from industrial unrest by protecting the rights of self-organization and collective bargaining, 29 U.S.C.A. § 151; National Labor Relations Board v. Fansteel Metallurgical Corp., 1939, 306 U.S. 240, 247, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599. By 29 U.S.C.A. § 160(a) the Act authorizes the Board "to prevent any person from engaging in any unfair labor practice (listed in section 158) affecting commerce." Within its grant of power the Board acts in the public interest to enforce a public right. Amalgamated Utility Workers v. Consolidated Edison Co., 1940, 309 U.S. 261, 60 S.Ct. 561, 84 L.Ed. 738; National Licorice Co. v. National Labor Relations Board, 1940, 309 U.S. 350, 366, 60 S.Ct. 569, 84 L.Ed. 799.

Without restriction the Board may exercise jurisdiction over any situation involving an unfair labor practice affecting commerce under the terms of § 160(a). Whether or not a collective bargaining agreement has been reached as between an employer and the representative of a group of employees is immaterial, for collective bargaining agreements do not necessarily accomplish peace; they are not a guaranty that no further unfair labor practices will occur or that such practices will not burden commerce. In point of possibility it may be said that arbitration decisions themselves may burden commerce. The instant case is proof enough that even the establishment of a grievance and arbitration procedure in a collective bargaining agreement may not eradicate serious disputes in an organization engaged in interstate commerce.

The Act itself contemplates a continuing jurisdiction by the Board over employer-employee relationships, for § 160 (a) includes a provision that the Board's power over unfair labor practices "shall be exclusive, and shall not be affected by any other means of adjustment or pre-vention that has been or may be established by agreement, code, law, or otherwise." Clearly, agreements between private parties cannot restrict the jurisdiction of the Board. National Labor Relations Board v. Newark Morning Ledger Co., 3 Cir., 1941, 120 F.2d 262, 267–268, 137 A.L.R. 849; National Labor Relations Board v. Prettyman, 6 Cir., 1941, 117 F.2d 786, 792; National Labor Relations Board v. General Motors Corp., 7 Cir., 1940, 116 F.2d 306, 312. Therefore, we believe the Board may exercise jurisdiction in any case of an unfair labor practice when in its discretion its interference is necessary to protect the public rights defined in the Act. The Board, then, had discretionary power to exercise its jurisdiction in the instant case.

Respondent argues that it is the policy of the National War Labor Board (NWLB) in the case of a discriminatory discharge dispute between employer and employees to require a resort to any such grievance and arbitration procedure as may have been established in a collective bargaining agreement and that the National Labor Relations Board (NLRB) should follow the same policy in the instant case since, according to respondent, the two boards have concurrent jurisdiction over disputes involving discriminatory discharges. Assuming that the policy of the NWLB is as defined by respondent, we think the NLRB is under no compulsion to conform to that policy. We mention again that the NLRB acts in the public interest to free interstate commerce from the burdens of specified unfair labor practices, including discriminatory discharges, and is given exclusive jurisdiction over such practices by 29 U.S.C.A. § 160(a) despite the existence of any other means devised for the settling of labor disputes. Consistently, the War Labor Disputes Act expressly directs that NWLB decisions shall conform to the provisions of the National Labor Relations Act, 50 U.S.C.A.Appendix, § 1507(a) (2); and Executive Order 9017, dated January 12, 1942, 50 U.S.C.A.Appendix, following § 1507, creating the NWLB prescribes in paragraph 7 that "Nothing herein shall be construed as superseding or in conflict with the provisions of * * * the National Labor Relations Act * * *." The result is inevitable that the NLRB may exercise its jurisdiction over the discriminatory discharge dispute herein in issue and is in no way governed by the NWLB policy favoring arbitration.

Our opinion in Consolidated Aircraft Corp. v. National Labor Relations Board, 1944, 141 F.2d 785, 787, does not support respondent's position. Therein, the court merely pointed out that the employer acted in good faith in asserting its view as to the wage rate controlling the Sunday morning work of its third shift and concluded that the employer had not interfered with, restrained, or coerced its employees' rights of collective bargaining guaranteed in 29 U.S.C.A. § 157. No inference can be drawn from such a conclusion that where an unfair labor practice within the terms of the National Labor Relations Act exists, the grievance and arbitration procedures established in a prevailing collective bargaining agreement must be exhausted before the NLRB will accept jurisdiction over the matter.

█ The Board in its Decision and Order found "that the respondent discriminated in regard to Babbitt's hire and tenure of employment, thereby discouraging membership in the Union, and interfering with, restraining, and coercing its employees in the exercise of the rights guaranteed them in Section 7 of the Act." Respondent insists that under the terms of 29 U.S.C.A. § 158(3) to support the Board's finding, there must be substantial evidence of a discriminatory discharge having both the *purpose* and the *effect* of encouraging or discouraging membership in any labor organization. It bases its view upon the language of the court in Western Cartridge Co. v. National Labor Relations Board, 7 Cir., 1944, 139 F.2d 855, 858; Stonewall Cotton Mills v. National Labor Relations Board, 5 Cir., 1942, 129 F.2d 629, 632; National Labor Relations Board v. Air Associates, 2 Cir., 1941, 121 F.2d 586, 592; Martel Mills Corp. v. National Labor Relations Board, 4 Cir., 1940, 114 F.2d 624, 633.

According to respondent's argument the closed shop agreement, in effect since the arbitration award of August 2, 1941, and the renewal closed shop agreement of October 2, 1942, still in effect, necessitating union membership of all employees at respondent's studio and within the union jurisdiction obviates any possibility of Babbitt's discharge discouraging membership in the Union. That Babbitt himself has consistently retained his union membership shows that not even he was discouraged, respondent argues.

We believe that the purpose and effect of a discriminatory discharge need not be shown by positive evidence but that if discouragement (or encouragement) as to union membership may reasonably be inferred from the circumstances of the discharge, the finding of the Board is binding upon the reviewing court. National Labor Relations Board v. J. G. Boswell Co., 9 Cir., 1943, 136 F.2d 585, 595. A careful study of the cases cited by respondent and of later cases decided by the same courts reveals that they do not support respondent's contention.

█ We cannot hold unfounded the inference that union membership was discouraged by Babbitt's discharge merely because a closed shop agreement was in existence and because Babbitt remained a member of the Union. As the Board points out, union membership of groups of employees not covered by the closed shop contract would be deterred by a show of hostility on the part of the employer. Those employees included in the contract might cease their efforts to obtain its periodic renewals. All employees might deem it wise to forego all active part in union affairs thereby in effect relinquishing their right to membership in a labor union. We think it clearly inferable from the fact of Babbitt's discriminatory discharge that membership in the Union would be discouraged. Therefore, the Board properly concluded that a violation of 29 U.S.C.A. § 158(3) had occurred.

█ The Board found, in addition, that Babbitt's discriminatory discharge was an unfair labor practice with respect to respondent's employees under 29 U.S.C.A. § 158(1). The only indications in the record of any interference with, restraint of, or coercion of respondent's employees in the exercise of rights guaranteed them in § 157 are the circumstances surrounding Babbitt's dismissal and a few acts and statements of Disney officials prior to the execution of the Union-respondent contract. Since respondent's objectionable behavior was not continued after the collective bargaining contract was entered into, and since the evidence indicates respondent's adherence to the contract terms except in is attitude toward Babbitt, it follows that respondent's treatment of Babbitt does not constitute evidence to the effect that respondent denies to its employees all of the rights guaranteed by § 157.

An examination of the Board's order will show: First, respondent is ordered to cease and desist from discouraging membership in the Union or any other labor organization of its employees "by discharging or refusing to reinstate any of its employees, or in any other manner discriminating in regard to hire and tenure of employment or any term or condition of employment." The Board may restrain unlawful acts related to an unfair labor practice. National Labor Relations Board v. Express Publishing Co., 1940, 312 U.S. 426, 436, 61 S.Ct. 693, 85 L.Ed. 930. However, the literal meaning of the quoted command is that respondent must not discharge or refuse to reinstate any employee, an order far beyond the scope of the unfair labor practice herein involved. The clause should be amended by inserting the word "discriminatorily" between "by" and "discharging or refusing to reinstate any of its employees."

Second, the Board orders that the respondent cease and desist from "(b) In any other manner interfering with, restraining, or coercing its employees in the exercise of the right to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purposes of collective bargaining or other mutual aid or protection, as guaranteed in Section 7 of the Act," 29 U.S.C.A. § 157.

This command is but a repetition of the statutory rights of employees which employers are bound to respect. The employer cannot by such a blanket order be put in danger of being hailed into court upon a citation for contempt for any subsequently alleged violation of the Labor Act without accusation and trial before the Labor Board.

The (b) portion of the Board's order is not justified as it enjoins acts entirely unrelated to any unfair labor practice engaged in by respondent. National Labor Relations Board v. Express Publishing Co., supra, 312 U.S. 426, 433-438, 61 S.Ct. 693, 85 L.Ed. 930; National Labor Relations Board v. Newark Morning Ledger Co., 3 Cir., 1941, 120 F.2d 262, 269, 137 A.L.R. 849. We decline to order enforced that part of the Board's order marked 1(b).

In addition, the Board orders that Babbitt be reinstated upon his discharge from the armed forces of the United States and be reimbursed the amount of his pay from the date of his dismissal, November 24, 1941, until the date of his application for reinstatement excluding the time he was on active duty in the armed forces. Respondent insists that the Board's order improperly sets the date of Babbitt's discharge as the time from which back wages should be paid to him since he unreasonably delayed some six months, until May 28, 1942, before filing charges with the Board. Babbitt testified that from January through April of 1942 he made a business trip to South America. It is clearly unjust, unless some mitigating circumstances are in evidence, to enhance the amount of back wages payable by an employer guilty of a discriminatory discharge because the discharged employee procrastinated for several months before filing charges with the Board. National Labor Relations Board v. Mall Tool Co., 7 Cir., 1941, 119 F.2d 700, 702; Subin v. National Labor Relations Board, 3 Cir., 1940, 112 F.2d 326, 331. No mitigating circumstances appear herein. The Board's order is hereby modified to direct that Babbitt be made whole for loss of wages beginning May 28, 1942.

The Board's order is modified in accordance with this opinion. In all other respects the order is approved and a decree of enforcement will be entered.