### NATIONAL LABOR RELATIONS BOARD v. RADIO OFFICERS' UNION OF COMMERCIAL TELEGRAPHERS UNION, AFL.

No. 158, Docket 22191.

United States Court of Appeals
Second Circuit.

Argued Feb. 7, 1952.

Decided May 6, 1952.

Clark, Circuit Judge, dissented.

George J. Bott, General Counsel, David P. Findling, Associate General Counsel, A. Norman Somers, Assistant General Counsel, and Owsley Vose and Willis S. Ryza, Attorneys, National Labor Relations Board, and Paul Kuelthau, all of Washington, D. C., for petitioner.

Butter & Silverman, New York City, Abner H. Silverman, Emanuel Butter and Alexander C. Russotto, all of New York City, of counsel, for respondent.

Before SWAN, Chief Judge, and L. HAND and CLARK, Circuit Judges.

SWAN, Chief Judge.

This is a petition by the National Labor Relations Board for enforcement of its order issued April 18, 1951 against the respondent union, 93 N.L.R.B. No. 249. The order found that the union had engaged in certain unfair labor practices in violation of sections 8(b) (1) (A) and 8(b) (2) of the National Labor Relations Act, as amended, 29 U.S.C.A. § 158(b) (1) (A), (2), by causing the A. H. Bull Steamship Company to discriminate against William Christian Fowler, a ship's radio operator and a member of the union, thereby causing Fowler to lose employment by the company on each of two occasions, namely, February 28, 1948 and April 26, 1948. It ordered the union to cease and desist from such unfair labor practices, and affirmatively, to give notice that it withdraws objection to Fowler's employment by the company and to make Fowler whole for any loss he may have suffered by reason of the union's preventing his employment on the above mentioned two occasions.

The questions presented for decision are (1) whether the record supports the finding that the union refused Fowler "clearance" to work on the Bull Company's ships; (2) whether such refusal was permitted by the terms of the contract between the Bull Company and the union; (3) whether the union's purported suspension of Fowler's union membership in February 1948 was valid; and (4) whether the facts as found establish a violation of sections 8(b) (1) (A) and 8(b) (2).

■■ The Board accepted the facts as found by the trial examiner. We also accept them. In so far as there was any dispute as to the facts, the findings depend upon the credibility of witnesses, whom the trial examiner heard and saw. As we recently said in N. L. R. B. v. Chautauqua Hardware Corp., 2 Cir., 192 F.2d 492, 494, "When an issue turns upon the credibility of witnesses, the Examiner's findings are especially entitled to be respected", citing Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 496, 71 S.Ct. 456, 95 L.Ed. 456. The record contains nothing which would justify holding the findings to be clearly erroneous; hence they are supported by "substantial evidence," as the statute requires. 29 U.S.C.A. § 160(e).

Briefly, the facts found by the examiner were as follows: Fowler, a ship's radio operator, joined the respondent union on July 1, 1942 and was a member in good standing in February and April, 1948. On February 24, Fowler received at his home in Miami, Florida, a telegram from the Bull Company, on whose ships he had previously worked, requesting him to "Proceed New York as soon as possible for position SS. Frances." Kozel, also a member of the union, had served as radio officer on the last voyage of the Frances and was discharged by Mr. Frey, the company's radio supervisor, on the termination of that voyage at New York. After Fowler arrived in New York in February 1948, the union refused to give him "clearance," i.e. a written statement of "good standing" in the union. This was because Mr. Howe, the general secretary of the union, believed that Fowler had pushed Kozel out of his job, although in fact Fowler had had nothing to do with Kozel's discharge. For lack of a "clearance" Fowler was not given employment on the Frances, and returned to his home in Florida. This was the February transaction.

On April 22, 1948 Fowler again came to New York and the next day informed Frey that he was available. He also talked with Howe who was willing to give him a job with other shipping lines but not with the Bull Company. Howe told Fowler: "You will be given no clearance for any Bull Line ship. Frey has been talking too much to you down there and making a company stiff out of you. I am going to break it

up right here and now." Frey testified that on April 26 he asked Howe for a clearance for Fowler on the S.S. Evelyn which was refused. Another union member was given the job. This was the April transaction.

■ At the time of the transactions above described a collective bargaining agreement was in effect between the union and the company.[1] The respondent contends that the agreement provided for a "hiring hall," the petitioner that it did not. If it was a hiring hall contract the union could select from among its members the one to be hired by the company; if it was not a hiring hall contract the privilege of initial selection was the company's, subject only to the employee being a union member "in good standing." The Board determined that the contract did not provide for a hiring hall. The correctness of this decision is the principal question before us. A majority of the court thinks it correct.

The pertinent provisions of the contract are printed in the margin.[2] By Section 1 the company agrees, when vacancies occur, "to select * * * members of the Union in good standing, when available, * * *

provided such members are in the opinion of the Company qualified to fill such vacancies." Section 3 provides that if no qualified member of the union is available, the company will, "before a non-member of the Union is hired" give the union an opportunity to furnish a radio officer with the license necessary for the position to be filled. Section 6 provides that the company "shall have the right of free selection" of its radio officers, and when a member of the union is "hired," the company must "take appropriate measures," to make sure that such member is "in good standing." If he is in good standing, the union agrees to give "the necessary clearance" for the position to which the radio officer "has been assigned"; and, if he is not, the union must so notify the company in writing. These provisions plainly give the company the right to select the man it desires to hire, and require the union to grant "clearance" if the man the company wants is a member in good standing. Such procedure is not a "hiring hall" arrangement. Even if we regarded the contract as ambiguous, which we do not, the doubt must be re-

1. The agreement was signed on January 11, 1947 and was extended on August 16, 1947 for a period of one year. Consequently under section 102 of the Taft-Hartley Act, 61 Stat. 152, 29 U.S.C.A. § 158 note, section 8(3) of the Wagner Act, 29 U.S.C.A. § 158(3), was applicable to it.

"Article I—Employment

2. "Section 1. The company agrees when vacancies occur necessitating the employment of Radio Officers, to select such Radio Officers who are members of the Union in good standing, when available, on vessels covered by this Agreement, provided such members are in the opinion of the Company qualified to fill such vacancies.

* * * * * *

"Section 3. When a member of the Union in good standing qualified to fill the vacancy is not available, the Company will notify the Union twenty-four (24) hours in advance before a non-member of the Union is hired, and give the Union an opportunity to furnish without causing a delay in the scheduled departure of the vessel a competent and reliable Radio Officer with the license necessary for the position to be filled.

* * * * * *

"Section 5. Radio Officers may be transferred from one vessel to another and nothing contained in this Agreement shall be construed as requiring the discharge of any presently employed Radio Officer who, in the opinion of the Company, is satisfactory, or to prevent the discharge of any Radio Officer who, in the opinion of the Company, is not satisfactory, provided, however, that if the Union feels that any discharge is discriminatory, it shall be dealt with as a grievance and provided further, that such discharge shall not interfere with or delay the dispatch of any vessel on her scheduled departure from any port.

"Section 6. The Company shall have the right of free selection of all its Radio Officers and when members of the Union are transferred, promoted, or hired the Company agrees to take appropriate measures to assure that such members are in good standing, and the Union agrees to grant all members of the Union in good standing the necessary 'clearance' for the position to which the Radio Officer has been assigned. If a member is not in good standing, the Union will so notify the Company in writing."

solved against the union. Hiring hall arrangements, like closed shop arrangements, are an exception to the general provisions in section 29 U.S.C.A. § 158(a) against employer discrimination, and "one seeking to come within the exception must clearly comply with its terms." N. L. R. B. v. Don Juan, Inc., 2 Cir., 178 F.2d 625, 627.

The union contends that, regardless of the terms of the contract, the uniform practice of the parties so modified them as to make the contract one for a hiring hall. The trial examiner found:

"Although the contract contained no reference to a hiring-hall arrangement, the companies generally requested the Respondent to furnish radio officers to fill vacancies. To meet these requests, the Respondent maintained a 'shipping list' of its unemployed members in the order of the termination of their last employment. When a request for a radio officer was received from a company, the Respondent offered the assignment and requisite clearance to those of its unemployed members who were waiting for assignments in the Respondent's office, in the order in which their names appeared on the 'shipping list' * * * While this appears to have been the general practice, Fred Howe, the Respondent's secretary-treasurer, testified that on some few occasions, companies have asked that particular radio officers be assigned to them. In some of these instances, the Respondent refused the requests; in other instances, the Respondent honored the requests although, as Howe put it, 'Some of the members don't think too much of that system.'"

■ Complaint is made that the union was restricted in its proof as to the practice of the parties under the contract. But we can find in the record no exclusion of proffered evidence which would have added

anything material to that which was summerized in the above quoted finding. We agree with the Board that such practice did not effect a surrender of the company's rights under the contract. In most instances the company may have found it more convenient to ask the union to send a man than to find one for itself, but a party to a contract does not lose clearly reserved rights merely by non-insistence upon them in every instance.[3]

■■ The union contends that in any event the refusal to grant a clearance to Fowler in February cannot be made the basis of an unfair labor practice charge because Fowler was not then in good standing—an adequate reason under the contract for refusing clearance. Howe, the general secretary of the union, ruled that Fowler was not in good standing since he had "bumped" a fellow union man. The trial examiner and Board found that Howe had no authority to make such a ruling, and we agree. A member of the respondent could be suspended in two ways: by the General Chairman with the consent of the General Committee or by the General Chairman alone, after first warning the member to correct his dereliction. Even if Howe was acting as General Chairman under Article 7, § 7 of the by-laws, he neither obtained the consent of the General Committee nor gave warning to Fowler before suspending him, and therefore the attempted suspension was invalid. Nor are we persuaded by the respondent's argument that neither the Board nor this court can review a union officer's interpretation of his own powers. Such a holding would permit rights guaranteed by the Act to be brushed aside by the artful drafting and interpretation of union constitutions and by-laws. Where those rights are concerned, there is as much reason to review the grounds for the suspension of a union member as to review an employer's asserted reasons for discharging an employee.

3. Walter Kidde & Co. v. Walton-Viking Co., 8 Cir., 153 F.2d 988, 991–992, certiorari denied 329 U.S. 715, 67 S.Ct. 45, 91 L.Ed. 620; South Atlantic S. S. Co. v. N. L. R. B., 5 Cir., 116 F.2d 480, 482, certiorari denied 313 U.S. 582, 61 S. Ct. 1101, 85 L.Ed. 1538; Dant & Russell, Inc. v. Grays Harbor Exportation Co., 9 Cir., 106 F.2d 911, 912, 125 A.L.R. 1302; In re Chicago & E. I. Ry. Co., 7 Cir., 94 F.2d 296, 299.

We think it clear that the union violated section 8(b) (1) (A) of the Act, 29 U.S.C.A. § 158(b) (1) (A), by "coercing" Fowler "in the exercise of the rights guaranteed in section 7". Among those rights is the freedom to refrain from taking part in the "concerted activities" of a union. The concerted activity in the case at bar was refusal to take employment with the company as a means of reprisal against it for discharging Kozel. Fowler's privilege of refraining from concerted activities was limited only to the extent of requiring membership in a labor organization as a condition of employment. The attempt to suspend him from union membership and the refusal of a clearance were economic coercion in its most effective form. Cf. N. L. R. B. v. Newman, 2 Cir., 187 F.2d 488, enforcing 85 N.L.R.B. 725, 730. The union's closed shop contract did not protect it because Fowler was in good standing as a member of the union. Before the union could deprive him of this status, it was obliged to adopt the disciplinary procedure provided in its constitution and by-laws. Consequently he was free to refrain from taking part in the union's concerted activity. Cf. Union Starch & Refining Co. v. N. L. R. B., 7 Cir., 186 F.2d 1008, 1011, certiorari denied 342 U.S. 815, 72 S.Ct. 30; Colonie Fibre Co. v. N. L. R. B., 2 Cir., 163 F.2d 65, 68–70.

The refusal to grant Fowler clearance although he complied with the only condition of employment—union membership in good standing—was also a violation of section 8(b) (2) of the Act, 29 U.S.C.A. § 158(b) (2), by inducing a violation of section 8(a) (3), 29 U.S.C.A. § 158(a) (3). Refusal of clearance caused the company to discriminate against Fowler in regard to hire. Without the necessary clearance it could not accept him as an employee. The result was to encourage membership in the union. No threats or promises to the company were necessary. See International Brotherhood of Electrical Workers v. N. L. R. B., 2 Cir., 181 F.2d 34, 38, affirmed 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299. Whether the union's motive was, as it argues, to enforce the contract provisions against discharging satisfactory radio officers such as Kozel, is immaterial, although its failure to invoke the grievance procedure of Article I, section 5 of the contract and its precipitate and invalid suspension of Fowler seem hardly consistent with such motive. And in the April transaction it refused to allow the company to employ him on any of its ships. Such conduct displayed to all non-members the union's power and the strong measure it was prepared to take to protect union members. Cf. Colonie Fibre Co. v. N. L. R. B., 2 Cir., 163 F.2d 65, 68, 69.

The union assigns a number of other errors which we find unsubstantial. The amendment of the complaint to include the February incident was properly granted and respondent obtained a recess to prepare his case. Respondent also argues that Fowler could not seek the Board's aid without first utilizing the grievance and review procedure in the contract and the union constitution and by-laws. But the Board here is asserting a public right, not Fowler's personal right, and the Board's power is not dependent on the availability of other means of adjustment. See § 10 (a) of the Act; National Labor Relations Board v. Newark Morning Ledger Co., 3 Cir., 120 F.2d 262, 268, 137 A.L.R. 849, certiorari denied 314 U.S. 693, 62 S.Ct. 363, 86 L.Ed. 554. Nor was there error in failing to join the company as a respondent in this proceeding. A finding that the union has violated § 8(b) (2) can be made without joining the employer and finding a § 8(a) (3) violation. See National Labor Relations Board v. Newspaper & Mail Deliverers' Union, 2 Cir., 192 F.2d 654, 656; National Union of Marine Cooks and Stewards, C. I. O. (George C. Quinley), 92 N.L.R.B. 877. Nor do we find the Board's back pay provision improper. The way is still open to determine, in the compliance proceedings the effect of Fowler's refusal to work on other ships.

The petition for enforcement is granted.

CLARK, Circuit Judge.

I dissent from the grant of enforcement on the grounds persuasively stated by

Board Member Murdock in dissenting below, 93 N. L. R. B. No. 249. (Board Member Reynolds also dissented as to the Board's ruling on the February incident, limiting "his finding of discrimination to the Respondent's failure to clear Fowler in April when his good standing has been restored.") Mr. Murdock first says:

"The majority of my colleagues and the Trial Examiner found the facts in this case, briefly stated, to be as follows. On February 27, 1948, complainant Fowler was offered a position as radio officer by the Bull Steamship line on its ship, the S. S. Frances. Fowler was, at this time, a member in good standing of the Respondent. In order that a vacancy in the position of radio officer on the Frances might exist, however, it was necessary for the company to discharge another member of the Respondent who was currently employed in that job.[1] Upon complaint of the displaced member, Howe, the secretary-treasurer of the Respondent thereupon suspended Fowler for 'bumping' another member and a subsequent request by the Company for clearance of Fowler for the position was denied by the Respondent. The suspension of Fowler was later lifted, but, when on April 26, the Company again offered Fowler employment as a radio officer on its vessel, the S. S. Evelyn, clearance was once more refused by Respondent. As a consequence of the refusal to grant the clearances, the positions, in both instances were filled by other members of the Respondent. Admittedly, in both instances, negotiations for employment of Fowler were carried on by the latter and the Company without reference to the Respondent other than the requests for clearance. The Respondent therefore contends that its actions were in accord with, and

protected by, the terms of its contract with the Company and the 'hiring hall' operated in conjunction with that agreement. I find the Respondent's argument persuasive."

He then continues (omitting some footnote references and explanations):

"There seems no question that, if the contract between the Respondent and the Company during the period concerned herein provided for employment of radio officers only through a union hiring hall, the denial of the clearances by the Respondent was both justified and protected under the terms of the amended Act. My disagreement with my colleagues, accordingly, centers upon the question of the existence of a hiring hall provision in that agreement. The record is clear, and indeed the Trial Examiner finds, that the various steamship companies, including the Bull line, who were parties to the contract, 'generally requested the Respondent to furnish radio officers to fill vacancies.' Further, 'to meet these requests, the Respondent maintained a "shipping list" of its unemployed members in the order of the termination of their last employment' and when a vacancy occurred, it was filled by offering the assignment and the requisite clearance to members of the Respondent on the shipping list in the order occurring there. Despite this clear showing of the existence and operation of a hiring hall, however, the Trial Examiner and the majority opinion contend such an arrangement is without provision in the contract between the parties and is thus unavailable to the Respondent as a defense. This conclusion, in direct contradiction of the established facts, is reached in view of a purported lack of a clear hiring hall provision in the agreement, the

---

[1]. So I think the opinion is in clear error in first indicating that Kozel was discharged for some unspecified reason and then stating, "although in fact Fowler had nothing to do with Kozel's discharge," as a rebuttal of the union secretary's belief "that Fowler had pushed Kozel out of his job." There are no such findings in the record, and the Trial Examiner's recital of those findings which were made "upon uncontradicted evidence" is to the contrary. Thus at the end of the "Frances'" voyage in February, Frey, the company's radio supervisor, "told Kozel that although his services had been satisfactory, he was to be replaced by 'a man with senior service in the company.'" So elsewhere the Examiner speaks of "Kozel, a member of the Respondent, whom Fowler was to replace."

eservation of the right of 'free selection' of employees by the companies, and the inclusion of a clause providing for written notice by the Union where a selected member was not in good standing. I cannot agree.

"The pertinent portions of the contract, as set forth in the Trial Examiner's Report, do not, by name refer to the establishment of a hiring hall for the employment of radio officers. To this extent the argument of the majority is well taken. In its previous decisions dealing with 'hiring halls' in the maritime industry, however, the Board has never made such a condition prerequisite to finding the existence of such systems, and has, indeed, recognized the existence of hiring halls where the contracts did not establish them in name. Nor does the reservation of a right of free selection by the companies necessarily controvert the existence of a hiring hall. While the inclusion of this clause, as argued by the Trial Examiner and the majority of the Board, conceivably negates the inference that a hiring hall was created by the contract, it is equally interpretable as merely protecting the right of the companies to reject unsuitable applicants for radio officer positions. As the Trial Examiner, at the hearing, excluded oral evidence as to the meaning of this term, among others, as interpreted by the parties, the precise effect of the language cannot be determined. On the other hand, the incontrovertible fact is that such 'free selection' considered granted in the contract by my colleagues, was never utilized by the companies to that effect, nor was there any attempt to do so. Its abstract existence is accordingly rebutted by the realities of the factual situation before us. Furthermore, the requirement of 'clearance' by the Respondent, a term the parties clearly indicated to be of special weight, before a free selection of applicants could be effected, is incompatible with the meaning attributed to the latter clause by the majority opinion. Finally, the reasoning of my colleagues that no occasion for written notice by the Respondent that any particular employee was not in good standing would arise unless the Company hired radio officers directly, misreads the clause in question.[2]

"Upon the entire record, and in view of the foregoing, I am persuaded and would find that a lawful hiring hall was established by the contract in question. Accordingly, as the actions of the Respondent herein were in accord with that contract, I would dismiss the complaint in its entirety."

His final statement is an argument that even if the contract were to be otherwise construed, the Respondent was not guilty of infringement of the Act with respect to the refusal to clear Fowler on February 27, because there was no clear showing beyond mere supposition that it had not complied with or had ignored its own rules of procedure. There was "a complete lack of protest by Fowler" at that time and reliance upon this ground forces the Board "into the new and untenable position of becoming the arbiter of proper observance of intraunion procedure."

Quite generally in labor disputes we see some indications of a history and an impact of personalities, surroundings, and local conditions, which, however, are at best only imperfectly translatable to the formal record. Because of this I have wished to trust as much as possible to not only the Board's greater "expertise" in the circumstances, but also its intuitive appreciation of the impelling force of the local background with which we are not acquainted. Here one senses that more background even than usual remains undisclosed, and our understand-

---

2. Mr. Murdock's footnote here reads as follows: "This clause does not refer to hiring alone, but also contemplates action taken in transferring or promoting employees. In these instances, it is clear, there would be ample reason for written notice by the Respondent if the recipient of the transfer or promotion was not in good standing. There is, therefore, no reason for assuming that the provision is inconsistent with a hiring hall. Moreover, as the majority opinion admits, the Trial Examiner's conclusion that no occasion for a twenty-four hour notice to the Respondent before the companies hired non-members would arise until, and unless, the companies had first directly and unsuccessfully sought to hire members of the Respondent is clearly erroneous."

ing of the case by that becomes the more unstable. The proceeding appears atypical; in what are apparently settled and peaceful union relations, the independent worker who attempts to go on his own to secure better individual treatment at the expense of union principles is given the green light by the Board for reasons I should think not merely legally inadequate, but also practically inimical to the advancement of peace on this labor front. Perhaps there is some good reason for this; I wish I knew. But on the present record I am constrained to conclude that enforcement should not be had of this Board order.