NATIONAL LABOR RELATIONS BOARD
v.
PHILADELPHIA IRON WORKS,
Inc. et al.
No. 11142.

United States Court of Appeals,
Third Circuit.

Argued Dec. 8, 1953.

Decided April 7, 1954.

Alan Waterstone, Washington, D. C. (George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Samuel M. Singer, Atty., National Labor Relations Board, Washington, D. C., on the brief), for petitioner.

Richard H. Markowitz, Philadelphia, Pa. (Louis H. Wilderman, Philadelphia, Pa., on the brief), for respondent Union.

Before KALODNER, STALEY and HASTIE, Circuit Judges.

STALEY, Circuit Judge.

The National Labor Relations Board petitions for enforcement of its order running against Philadelphia Iron Works, Inc., and Local No. 13, International Brotherhood of Boilermakers, Iron Ship Builders and Helpers of America, AFL. The board found, in agreement with its trial examiner, that the company and the union had maintained and enforced illegal hiring provisions in their collective bargaining contract which limited employment by the company to applicants who were union members in good standing and who were referred by the union. This was the first of two interrelated factual situations upon which were based violations of Section 8(a) (1), (2), and (3), and Section 8(b) (1) (A) and (2), by the company and the union, respectively. The second incident was a direct, specific result of the unfair hiring practices set out above. The board found that, because of the union's demand, the company rescinded its previous offer to employ the charging party, Theodore Fink. This was made the basis of a separate violation by the company of Section 8(a) (1) and (3), and, since the company refused to hire Fink because of union pressure,

was found to be a separate violation by the union of Section 8(b) (1) (A) and (2). The order requires that the company and the union cease and desist from commission of the various unfair labor practices found, that the company reinstate Theodore Fink as soon as a job within the union's jurisdiction becomes available, that the union notify the company that it requests such reinstatement, that both respondents, jointly and severally, make Fink whole for any loss of pay caused by their discrimination, and that they post the customary notices. 103 N.L.R.B. No. 65 (1953).

The company is engaged in the fabrication and erection of steel plate products. Only the union opposes the board's petition, the company not having appeared here.

The union's first point is that we must deny enforcement because the findings are not supported by substantial evidence on the record considered as a whole. In view of the strenuous argument, we will set out the testimony in some detail, starting with the evidence relating to the general hiring practices.

The company and union have dealt with each other since 1929. Until the time of the Labor Management Relations Act of 1947, they maintained a closed shop. At that time, the contract was changed in order to comply with the Act. In July of 1950, a new contract was entered into and was in effect at all times that concern us here. Under Article 2 of the contract, the company "agrees to employ only Boilermakers and Helpers in the performance of the work included within the scope of this Agreement," and the union "agrees to furnish competent Boilermakers and Helpers" to the company. Article 21, Section 2 and Article 14, Section 3 make the "Working Conditions" of the union a part of the contract. Rule 17 of the working conditions reads: "Only members in good standing shall be employed on all jobs coming under the jurisdiction of Lodge 13. All such men shall be hired through the Business Representative of Lodge 13." Testimony of the Fink

brothers and union officials explained the prerequisites of the required referral. Referrals are made on the basis of a member's status on the "out of work list." The mechanics are that when a member is out of work he places his name at the bottom of a list maintained at the union hall. As different companies that use boilermakers need men, they call the union and state their requirements. The union, acting through its business representative, Kennedy, then sends out those men whose names are at the top of the list. As a man is sent to a new job, the union's business representative sends a slip with him, containing the union's consent to his going to work. When a man first reports to a job, the union steward checks his status in the union. Ryan, then the union's vice-president, testified that "No one goes to work without the consent of Brother John Kennedy." He said that all assignments are made by the union solely on the basis of the out-of-work list and that if a man's name is not on that list he is "just forgotten about." The list, of course, is open only to union members. Ryan stated that if a man should by-pass the list, he "would be knocked off the job by the steward * * *."

▇ Since "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight," Universal Camera Corp. v. National Labor Relations Board, 1951, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L. Ed. 456, we must consider the other side of the coin. There was testimony by Faix, the company's vice-president and superintendent, and by Barr, the secretary-treasurer, to the effect that the company was not restricted to hiring only those referred by the union and that men were in fact hired who had not been sent by the union. Even aside from questions of credibility, however, which

we think is still a matter for the trial examiner, there was other testimony that these independent hirings took place during a period of some unemployment in the trade and after the union members had been told by Kennedy that they could take what jobs they could get at small shops without resort to the out-of-work list. Two such independent hirings concerned the charging party himself. The first occurred in October of 1951, shortly after the filing of the charge in this case. The job on which he was hired, however, was outside the union's jurisdiction and was, thus, not at all inconsistent with the board's findings relating to events within its jurisdiction. In that instance, the union was powerless to do anything about his being hired. This hiring might well be the exception that proves the rule. The second such hiring took place in March of 1952, subsequent to the filing of the amended charge. While that independent hiring would be a factor for the board's consideration in weighing the evidence for and against the union, it might be reasoned that the filing of the charges had finally convinced the union that it had better let Mr. Fink pursue his trade without further hindrance.

The union says that there was no testimony that the company was even aware of the working conditions. Such testimony is unnecessary, however, in view of the express reference to them in the collective bargaining contract. The company is in no position to deny knowledge of what it has expressly made a part of its contract.

▇▇ Next, it is said that the working conditions were meant only as rules for the internal administration of the union.[1] If they were so intended when originally drafted, they lost that character when they were made a part of the collective contract and became binding upon the parties. Furthermore, while

---

1. The following is a proviso to Section 8 (b) (1) (A): "Provided, That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein * * *." 61 Stat. 140 (1947), as amended, 65 Stat. 601 (1951), 29 U.S. C.A. § 158(b) (1) (A).

the proviso to Section 8(b) (1) (A) protects the union's right to prescribe its own rules with respect to the acquisition or retention of membership therein, it does not authorize the union to extend the effective scope of those rules so that they determine the right of a member to the acquisition or retention of a job.[2] That is, we assume that a perfectly proper sanction for Fink's disregard of the out-of-work list would be expulsion from the union. That body may not, however, on these facts, punish Fink's dereliction by using its influence to prevent his being employed. Union Starch & Refining Co. v. National Labor Relations Board, 7 Cir., 186 F.2d 1008, 1012, 27 A.L.R.2d 629, certiorari denied, 1951, 342 U.S. 815, 72 S.Ct. 30, 96 L.Ed. 617. Indeed, Section 8(a) (3) (B) and Section 8(b) (2) make it very clear that failure to tender dues and initiation fees is the only ground upon which the union can legitimately cause an employee's discharge.

We conclude that, while the board could have found to the contrary on the question of respondents' general hiring practices, the record as a whole contains substantial evidence for the findings that it did make. We pass, therefore, to the issue of the sufficiency of the evidentiary support for the findings relating to the alleged refusal to hire the charging party.

Theodore Fink had been a member of the union in good standing for a number of years before the hearing. The following is his story as to what occurred. In early September of 1951, he was out of work. On September 8, he called Faix at his home but was unable to get in touch with him. The next day Faix returned the call, and Fink asked him for a job. Faix said he would call Fink in a day or two. The next morning, September 10, 1951, as a result of a message Fink received from his son, he called Faix and was told to report to the company's job at "Stetson Hats."

Faix then asked him what he was going to do about "the union" or "about Kennedy." His answer was that he was going to call the union office and tell Kennedy that he had a job and was going to go to work. He then called the union office but was unable to get in touch with Kennedy until about two-thirty in the afternoon. When he did contact Kennedy, he told him he had a job with the Philadelphia Iron Works, to which the latter replied: "You are not going there * * * you are not on the top of the list, and you are not eligible to go there." Fink then said, "Well, I am going to go to work, and if you are big enough to knock me off, Mr., you come up and do it." Kennedy's parting shot was, "Well, I am big enough." Fink then called the Stetson Hats job and spoke to his brother Charles, who was the company's foreman, and told him that it was then too late to report that day and asked whether the job would be open the next day. He was told that it would, and he said he would be there in the morning. That evening the trouble began. Faix called Fink and told him not to report for work the next morning. Fink testified that Faix then told him the reason he was not to report for work. He said that Faix said that Kennedy had called and told Barr that Fink was not to be hired. Charles Fink, the company's foreman at the Stetson Hats job, substantially corroborated Theodore Fink on this point. This testimony of both witnesses was admitted over the objection that, as to the union, it was inadmissible hearsay. In any event, Fink did not go to work the next morning. Barr testified that Kennedy had called the company on or about the day when Fink was told not to come to work and that Kennedy inquired as to the company's need for men and said that if any were required he should be contacted. Faix said that his son, a company estimator, received a call from the union, asking about the need for

---

**2.** The parties do not attempt to justify their conduct upon the basis of a valid union-security clause negotiated in con-formity with § 8(a) (3). Indeed, there was no such clause in existence.

men. Barr said that it was unusual for Kennedy to call and tell him he had union men unemployed and to inquire if work was available. Finally, Ryan, the union vice-president, testified that, about ten days after the incident, Kennedy told him that "Fink, he tried to act wise this week * * * he went up to the Philadelphia Iron and tried to get his own job, but I knocked him back on the list." About October 8, 1951, after Fink had filed the original charge, Faix offered him a job in New Jersey. Faix said that he had contacted Kennedy on the matter and that the latter said that the job was out of the union's jurisdiction and that he (Kennedy) could not interfere. In March of 1952, Fink was hired by another company on a job in Philadelphia and has since worked without resort to the out-of-work list and without interference by the union.

On the other hand, both Barr and Faix, testifying for the company, denied that Kennedy had told them not to hire Fink. Faix said that an extra man was needed in order to help move material into a building at the Stetson Hats job. Later that day, Faix discovered that, even without the help of an extra man, all the material had been put in place. Therefore, in the interests of keeping costs down, Faix decided that there was no need for another man, and he notified Fink not to report for work.

■ As to the incident regarding Fink, the testimony would have been adequate to support a finding in respondents' favor. The evidence leaning in the other direction was just as adequate, however. The trial examiner and the board, after consideration of both views, concluded that the general counsel's made the most acceptable story of what actually happened. Of all three judging bodies so far concerned with this case, the trial examiner, the board, and this court, only the first had the opportunity of observing the witnesses as they related what they knew about the matter. Obviously, he was in the best position to weigh and sift the testimony. He was not impressed by the testimony of Barr and Faix. He said it "reveals a maze of inconsistencies, contradictions, and outright improbabilities." However that may be, we think, after consideration of all the evidence, that the board's findings are amply supported.

■ We must deal for a moment with the union's contention regarding the allegedly erroneous admission of hearsay evidence. As we have said, Theodore Fink testified that when Faix called him and told him not to report for work, he said that Kennedy had told Barr, who in turn told Faix, that Fink should not be hired. Charles Fink testified along substantially the same line. The board ruled that this was admissible against the company because within the admission exception to the hearsay rule. The union objects, however, relying mainly upon the following language of Section 10(b) of the Act, dealing with the conduct of board proceedings: "Any such proceeding shall, so far as practicable, be conducted in accordance with the rules of evidence applicable in the district courts of the United States * * *." [3] We need not determine, however, how this language, which came into the Act in 1947, changed the evidentiary rules in labor board cases or what effect it might otherwise have on our case, because the board stated in no uncertain terms that, as to its findings against the union, it did not rely on the contested testimony. It said, and we agree, that there was other proper, probative evidence which established that the union's pressure caused the company to refuse to hire Fink. This other evidence included Kennedy's statement that Fink could not take the job because he was not eligible, his name not being at the top of the out-of-work list; the admissions of Barr and Faix that, contrary to the usual course of events, the union had contacted the company inquiring about the availability of jobs and stating that, if men were needed, Faix should notify the union; and Ken-

---

3. 48 Stat. 926 (1934), as amended, 29 U.S.C.A. § 160(b). .

nedy's statement to Ryan, after the event, that Fink had tried to get a job on his own but that he had knocked him back on the list.[4] Surely, a district judge sitting without a jury is not to be reversed simply because some inadmissible evidence got into the record, if he states in his opinion that he did not rely upon the improperly admitted evidence but based his decision upon other, qualified evidence. If that is so, we see no reason to upset the board's decision here where it has done the same thing.[5]

Having concluded that the board's findings of fact are supported by substantial evidence on the whole record, we must determine whether what the respondents did violated the Act.

In view of the fact that the company has not opposed the board's petition here, the only remaining issue is the legality or illegality of the union's conduct.

It was found that the union violated Section 8(b) (1) (A) and (2) by its execution, maintenance, and enforcement of that part of the collective contract which limited employment by the company to applicants who were union members in good standing and who were referred by the union. The pertinent statutory provisions are set out below.[6]

While it is true that a referral system is not per se invalid, Eichleay Corp. v. National Labor Relations Board, 3 Cir., 1953, 206 F.2d 799, it violates the above subsections if the union applies it discriminatorily. Thus, a system under which only union members in good standing are referred is clearly illegal. National Labor Relations Board v. F. H. McGraw & Co., 6 Cir., 1953, 206 F.2d 635; National Labor Relations Board v. Radio Officers' Union, etc., 2 Cir., 1952, 196 F.2d 960, affirmed, 1954, 347 U.S. 17, 74 S.Ct. 323; Red Star Express Lines of Auburn, Inc., v. National Labor Relations Board, 2 Cir., 1952, 196 F.2d 78. The enforcement of such a system certainly tends to encourage membership in a labor organization. Likewise, it tends to restrain and coerce employees in the exercise of their right, guaranteed by Section 7, to refrain from engaging in concerted activities. It was also found that the union had violated Section 8(b) (1) (A) and (2) by causing the company to refuse to hire Fink because he had short-circuited the out-of-work list. Such conduct is patently illegal. Radio Officers' Union, etc., v. National Labor Relations Board, 1954, 347 U.S. 17, 74 S.Ct. 323.

---

4. These statements of Kennedy were admissible against the union as admissions. 4 Wigmore, Evidence §§ 1048 and 1078 (3d ed. 1940).

5. Builders Steel Co. v. Commissioner of Internal Revenue, 8 Cir., 1950, 179 F. 2d 377; 1 Wigmore, id. §§ 4a, 4b, 4c; Davis, Administrative Law § 142 (1951).

6. "(b) It shall be an unfair labor practice for a labor organization or its agents—
"(1) to restrain or coerce (A) employees in the exercise of their rights guaranteed in section 157 of this title * * *.
"(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a) (3) of this section * * *." 61 Stat. 140 (1947), as amended, 65 Stat. 601 (1951), 29 U.S.C.A. § 158(b) (1) (A) and (2).
Section 7 reads as follows:
"Right of employees as to organization, collective bargaining, etc.

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a) (3) of this title." 49 Stat. 452 (1935), as amended, 61 Stat. 140 (1947), 29 U.S.C.A. § 157.
The relevant part of § 8(a) (3) provides that it shall be an unfair labor practice for an employer
"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization * * *."

944

Next, the union points out that Fink was and, for all we know, still is a member of the union in good standing and that there was no evidence that what was done to him in any way encouraged him to remain a union member. The argument is that discrimination there may have been, but, without a showing that it encouraged or discouraged membership in a labor organization, there has been no violation of 8(b)(2). The Supreme Court, in the Radio Officers case, supra, decided subsequent to the argument in our case, has decided that point against the union's position. The answer is so recent and so conclusive that it obviates the need for further discussion on our part.

Finally, we are told that there has been no 8(b)(1)(A) violation here because that subsection reaches only that union conduct which restrains or coerces employees by means of force or violence and that, contrary to the legal theory of the relationship between Section 8(a)(1) and the other four subsections of 8(a), a violation of Section 8(b)(1)(A) does not flow automatically from a violation of Section 8(b)(2). We quite agree that 8(b)(1)(A) reaches force and violence that restrains or coerces employees in the exercise of Section 7 rights, but we think a union may not escape simply because there was not an assault and battery. Section 7 guarantees the right to refrain from concerted activities. The concerted activity here involved was, as the board's brief puts it, "the collective preemption of employment for union members and the use of the 'out-of-work' list in the allocation of available jobs." Fink chose not to join in that concerted activity. Because he did so, the union caused the company to refuse to hire him. We think that a rather obvious form of restraint and coercion. Nor is the union saved because it acted through the company. Coercion once-removed is just as effective as if the union were to act upon the employee immediately. National Labor Relations Board v. International Longshoremen's and Warehousemen's Union, 9 Cir., 1954, 210 F.2d 581; National Labor Relations Board v. Bell Aircraft Corp., 2 Cir., 1953, 206 F.2d 235; National Labor Relations Board v. Radio Officers' Union, etc., 2 Cir., 1952, 196 F.2d 960, affirmed, 1954, 347 U.S. 17, 74 S.Ct. 323; National Labor Relations Board v. International Union United Automobile, Aircraft and Agricultural Implement Workers, 7 Cir., 1952, 194 F.2d 698. See also, Capital Service, Inc., v. National Labor Relations Board, 9 Cir., 1953, 204 F.2d 848, 852. Cf. National Labor Relations Board v. Jarka Corp. of Philadelphia, 3 Cir., 1952, 198 F.2d 618.

It may be worth noting that the reinstatement and back-pay paragraphs of the board's order are appropriate whether the union's conduct constituted violations of Section 8(b)(1)(A) or 8(b)(2). The broad cease and desist order does, however, depend upon a violation of 8(b)(1)(A). Hence, the necessity for the preceding paragraph.

A decree for the enforcement of the board's order may be submitted.