**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**NEWSPAPER & MAIL DELIVERERS' UNION OF NEW YORK & VICINITY, Independent, Respondent.**

No. 12086.

United States Court of Appeals Third Circuit.

Argued March 7, 1957.

Decided June 25, 1957.

Stephen Leonard, Washington, D. C. (Kenneth M. McGuiness, Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Arnold Ordman and William J. Avrutis, Washington, D. C., Attys., National Labor Relations Board, on the brief), for petitioner.

Asher W. Schwartz, New York City (O'Donnell & Schwartz, Counsel to the Newspaper & Mail Deliverers' Union of New York & Vicinity (Independent), New York City, N. Y., on the brief), for respondent.

Before MARIS and GOODRICH, Circuit Judges, and McILVAINE, District Judge.

McILVAINE, District Judge.

This case is before the Court on petition of the National Labor Relations Board pursuant to § 10(e) of the National Labor Relations Act as amended, 29 U.S.C.A. § 151 et seq., for enforcement of its order issued against Newspaper & Mail Deliverers' Union of New York & Vicinity, Respondent, hereinafter called the Union, on May 16, 1956.

The employer in this case, the Passaic County News Co., Inc., uses two types of employees in its business of wholesale distribution of newspapers and periodicals. It employs men known as regular situation holders for steady full-time jobs. In addition, to meet varying demand, it hires so-called "extras" on a day-to-day basis. The latter present themselves at the company plant in search of work, the arrangement being known as a shape-up.

The employer here is a party to a Wholesaler's Association contract made with the Union on February 1, 1955, and running until January 31, 1957. Under the provisions of this contract any employee receiving 5 days' work a week for a period of 5 consecutive weeks shall become a regular situation holder and be listed on the company seniority and priority list in accordance with his length of service. And in general under this contract, seniority is a governing factor in the hiring of extras, and except for considerations of union membership, it has been the company policy in hiring extras to give jobs to applicants in the shape-up on the basis of seniority.

However, early in 1955, William Walsh, the Union's business agent, called at the company plant and told John Fylstra,

the president and general manager of the company, that a union card must give its possessor in a shape-up the first right to go to work. This admonition by Walsh to Fylstra had been repeated on several occasions and in March of 1955, Walsh instructed Night Foreman Alexander Herald that Union men come first in hiring extra help. Walsh also told the Day Foreman John Smith in June that whenever possible he wanted union men to be used.

The company failed to hire one Philip Goldberg, a member of the Union, as an extra before it hired nonunion men. On May 30, 1955, the Union protested. Walsh conferred with Fylstra, Herald, and Assistant Night Foreman Louis Vitale, insisting that regardless of anything else, Union men, like Goldberg, were to be hired first and "he didn't want to know nothing else." Walsh continued in this attitude at an Adjustment Board meeting set up to consider the Goldberg grievance. He declared that "Union men have to go to work before nonunion men." Joseph Simons, the Union's vice-president, was also present, and mentioned that to prevent an extra employee working a 5-day week for 5 successive weeks and thus becoming a regular situation holder under the contract, other wholesalers did not let nonunion extras work more than 4 consecutive weeks, and wished that this company would follow the same practice.

The Company complied with the Union's requests, and continued to hire union men from the shape-up in preference to nonunion men regardless of their respective seniority. New applicants were asked if they had a Union card, and upon the production of same they were assigned without further inquiry to extra work in preference to nonunion men who had worked at the plant previously.

James Courtis, who is not a member of the Union, appeared in the shape-up during 1945, and appeared regularly at shape-ups since 1953, presenting himself for both night and day work. Since 1953, he has qualified as a regular situation holder a number of times, and in 1955, had worked 12 consecutive 5-day weeks. However, the company listed him as an extra worker who must join the shape-up for employment.

Between June 16, 1955, to the date of the hearing in January, 1956, Courtis presented himself regularly at the company's shape-up for employment. However, the company hired Union members for extra work on 35 or more occasions, while denying employment to Courtis who had greater seniority. Courtis protested this action to his foreman. He was advised by Smith, Vitale, and Herald that the men hired were Union men. Courtis also made inquiry of the Union's shop steward who advised him that since the men hired held Union cards they had preference. The President of the company admitted that though Courtis had greater seniority he wasn't hired because Union men had priority.

From these facts the Board concluded that the Union had violated § 8(b) (2) and (1) (A) of the National Labor Relations Act, by maintaining and enforcing a discriminatory arrangement with the employer for granting preference in hiring to members of the Union and thereby causing the company to deny Courtis regular, steady employment and status as a regular situation holder because of his non-membership in the Union.

Accordingly, the Board required the Union to cease and desist from restraining or coercing employees or applicants for employment in any like or related manner at this company or any other employer.[1]

---

1. The Respondent, Newspaper & Mail Deliverers' Union of New York & Vicinity, Independent, its officers, representatives, agents, successors and assigns shall:
   1. Cease and desist from:
   (a) Maintaining or enforcing any working arrangement with Passaic County News Co., Inc., or any other employer whereby preference in employment is granted to union members except in accordance with § 8(a) (3) of the Act;
   (b) Causing or attempting to cause Passaic County News Co., Inc., or any other employer to deny regular, steady employment or status as regular situation holders to employees and prospective em-

The Board also directed the Union to notify the company in writing that it had no objection to the company's granting James Courtis or any other employee regular, steady employment and status as situation holders even though they are not members of the Union. The company was ordered to cease and desist from maintaining or enforcing any discriminatory working arrangement with the Union or granting preference to the Union or discriminating against employees because of their nonmembership in the Union. Both the Union and the company were ordered to make James Courtis whole for any loss of pay he may have suffered by reason of the discrimination against him.

The National Labor Relations Board now seeks enforcement of its order against the Union by an appropriate court decree, but is not asking for a court decree to enforce its order against the company. It appears that both the company and the Union are complying with the order of the Board; and the Union, therefore, urges that in view of the fact of there being compliance the question of enforcement is moot. However,

"* * * compliance with an order of the Board does not render the cause moot, depriving the Board of its opportunity to secure enforcement from an appropriate court. * * * A Board order imposes a continuing obligation; and the Board is entitled to have the resumption of the unfair practice barred by an enforcement decree * * * 'no more is involved than whether what the law already condemned, the court shall forbid; and the fact that its judgment adds to existing sanctions that of punishment for contempt, is not a circumstance to which a court will ordinarily lend a friend-

ly ear.' National Labor Relations Board v. General Motors Corp., 2 Cir., 1950, 179 F.2d 221, 222. The Act does not require the Board to play hide-and-seek with those guilty of unfair labor practices." National Labor Relations Board v. Mexia Textile Mills, 1950, 339 U.S. 563, 567, 70 S.Ct. 826, 828, 833, 94 L.Ed. 1067.

The fact that the Union has complied with the order of the Board does not prohibit the Board from asking this Court to issue an injunction enforcing the order nor deprive this Court of jurisdiction to enforce same.

The second question raised is that even if compliance does not render the issue moot and deny this Court jurisdiction, the Union urges that the Board cannot have enforcement of its order only against them without enforcement against the company as well. It is fundamental that Congress has entrusted the enforcement and administration of the National Labor Relations Act to the National Labor Relations Board. Discretion is vested in the Board. It has the discretion of asking the Courts to enforce its orders; it is not compelled by statute to seek enforcement of its orders. It is for the Board, and not the courts to draw the inference from the facts as to what means of affirmative relief are necessary to undo the effects of an unfair labor practice and to effectuate the policies of the Act. See Bethlehem Shipbuilding Corp. v. National Labor Relations Board, 1 Cir., 1940, 114 F.2d 930, certiorari dismissed, 312 U.S. 710, 61 S.Ct. 448, 85 L. Ed. 1141.

At first blush one might think that the order against the employer was no longer in effect because the Board is not seeking judicial enforcement of it, and this might have a practical effect

ployees, including specifically Courtis, because of their nonmembership in Respondent Union except to the extent permitted by § 8(a) (3) of the Act;

(c) In any like or related manner restraining or coercing employees of or applicants for employment with Passaic County News Co., Inc., or any other em-

ployer in the exercise of their rights guaranteed in § 7 of the Act, except to the extent that such rights may be affected by an agreement requiring membership in a labor organization as a condition of employment, as authorized by § 8(a) (3) of the Act.

in future relationships between the Union and the employers. However, nothing could be further from the truth. The order against the employer stands in full force and effect. The Board in its judgment felt that additional measures were necessary against the Union because of its past experiences with the Union. This was within the Board's discretion. It is very possible that the Board feels that its order alone against the company, coupled with the Court's order of enforcement against the Union, will tend to eliminate the illegal hiring practices involved and, thus, effectuate the policies of the Act. Such considerations are necessarily within the realm of the experts whose day-to-day touch with the problems of labor relations should give them a feeling for the appropriate remedies necessary under the circumstances. The law as we have previously stated gives the enforcement and the administration of the Act to the Board. This Court will use its enforcement powers when called into play in accordance with the law. It is not for this Court to make policy of how to administer the National Labor Relations Act. We are here to insure its fair administration in accordance with law. Eichleay Corp. v. National Labor Relations Board, 3 Cir., 1953, 206 F.2d 799.

■ The Board's decision seeking enforcement against the Union is based on substantial evidence and is not arbitrary or capricious. Accordingly, enforcement can be granted. National Labor Relations Board v. Philadelphia Iron Works, 3 Cir., 1954, 211 F.2d 937.

■ The third argument of the Union is that the Order is too broad in that it seeks to restrain action of the type complained of herein against all other employers.

"To justify an order restraining other violations it must appear that

they bear some resemblance to that which the employer has committed or that danger of their commission in the future is to be anticipated from the course of his conduct in the past." National Labor Relations Board v. Express Publishing Co., 1941, 312 U.S. 426, 437, 61 S.Ct. 693, 700, 85 L.Ed. 930.

The Board has found that the Union committed acts in violation of the law in that they maintained, enforced, and attempted to cause discriminatory hiring arrangements and

"It is a salutary principle that when one has been found to have committed acts in violation of a law he may be restrained from committing other related unlawful acts." National Labor Relations Board v. Express Publishing Co., supra, 312 U.S. 436, 61 S.Ct. 699.

In this case the Board did not issue a broad order against all unlawful restraint or coercion, but limited it to restraint or coercion which was like or related to that which the Union was found to have engaged in in this case. In reaching its conclusion to restrain like or related violations, the Board had before it evidence that the Union caused other wholesalers to carry out discriminatory hiring arrangements, and that the Union, itself, had committed similar violations.[2]

This Court feels that the record as a whole satisfies the requirement that there was substantial evidence to support the Board's findings and, therefore, their order may be enforced. See National Labor Relations Board v. Jarka Corp. of Philadelphia, 3 Cir., 1952, 198 F.2d 619. National Labor Relations Board v. Philadelphia Iron Works, 3 Cir., 1954, 211 F.2d 937.

The Board may submit an appropriate Order for enforcement to the Court.

2. The Board has issued cease and desist orders for similar activities in the case of J. Brodsky & Sons, 114 N.L.R.B. 819 (1955). It also appears that the same Business Agent William Walsh who acted for the Union in the case now before the Court did the same act complained of here against another employer in that he required another employer to "knock off" a regular employee and replace him with a union man who was not a regular employee. See Union County Newsdealer Supply Co., 114 N.L.R.B. 1575 (1955).