NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

MILLWRIGHTS' LOCAL 2232, DISTRICT
COUNCIL OF HOUSTON AND VICIN-
ITY, and United Brotherhood of Car-
penters and Joiners of America, AFL–
CIO, Respondents.

No. 17777.

United States Court of Appeals
Fifth Circuit.

April 11, 1960.

Jones, Circuit Judge, dissented.

Herman I. Branse, Atty., Thomas J. McDermott, Marcel Mallet-Prevost, Associate Gen. Counsel, Stuart Rothman, Gen. Counsel, Melvin J. Welles, Atty., N.L.R.B., Washington, D. C., for petitioner.

C. Paul Barker, Dodd, Hirsch, Barker & Meunier, New Orleans, La., Francis X. Ward, William A. McGowan, Gen. Counsel and Asst. Gen. Counsel, United Brotherhood of Carpenters and Joiners of America, Indianapolis, Ind., of counsel, for respondents.

Before RIVES, Chief Judge, and JONES and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

The Board seeks enforcement of its Order, 122 NLRB 41, against Local 2232, the District Council, and International Union [1] for maintaining and enforcing a discriminatory hiring arrangement in violation of § 8(b)(2) and (1)(A). 29 U.S.C.A. § 158(b)(2) and (1)(A). In addition to the usual cease and desist remedy, the Order requires reimbursement of union dues and assessments. We enforce in part.

The alleged discriminatory hiring was on a construction project of Farnsworth & Chambers (called the Company) in Houston. The evidence of the unlawful hiring practices was (1) a contract governing the hiring of millwrights, (2) various provisions of the constitution and bylaws of the International, the District council and Local 2232, (3) the general hiring practices of Local 2232 and (4) a particular occurrence in which two applicants for employment, Legg (the charging party) and Spiers, were delayed from beginning work for one day due to the unlawful hiring hall.

### The Contract.

The contract governing the employment of millwrights was made between Local 2232 and the District Council on the one hand and two trade groups of employer-contractors of which the Company was a member, on the other.[2] It was a general agreement covering employment of millwrights in various counties in Texas. The contract, which was in effect during the events of this case, required the Company—as a member of its trade association—to use Local 2232 as a source of millwrights. "Working Conditions," promulgated by Local 2232 which were incorporated into the contract, mandatorily required that in "every job that employs two or more Millwrights, one must be designated as Millwright Foreman." Further, the "Millwright Foreman shall have the sole authority to hire and fire the men under them." Moreover, "Millwrights shall not be required to take orders from any person except Millwright Foremen in charge of work." It further provided that a foreman's crew may not exceed 10 men and if there is more than one crew, there must be a "General Millwright Foreman." In addition to these men, the Working Conditions provided that a millwright steward be designated for every job by the business agent of Local 2232.

The validity of this contract as such is not in issue. On its face, it does not call for discriminatory hiring of union millwrights.

### The Constitution and Bylaws.

However, the Constitution and Bylaws of the International—which are binding on its member unions—completely alters the innocuous nature of the provision of the contract's "Working Conditions" giving the exclusive right to hire and fire to the millwright foreman. For the International's Bylaws peremptorily provide

1. These abbreviations refer to the three respondents: Millwrights Local No. 2232; District Council of Houston & Vicinity; & United Brotherhood of Carpenters and Joiners of America, AFL-CIO.

2. The two trade associations were the Construction Employers Association of Texas and the Houston Chapter of Associated General Contractors of America, Inc. The contract was signed on July 14, 1955 with the expiration date of March 31, 1958.

that members who are foremen may "hire none but members of the United Brotherhood." The restriction is further carried out by provisions in the Bylaws of the District Council and Local 2232 designed to secure preference to members in good standing of Local 2232. Under them, a member seeking work must have a referral slip from the union business agent which must be presented to the union steward, in turn appointed by the business agent, at the job before beginning work. The foreman may not permit the employee to work until this is done. In addition, payment of all union dues, assessments and fines is a requisite to referral.

## General Hiring Practices.

Here, supported by substantial evidence, the Board found that closed shop conditions existed on the construction project. In addition, it found that the union maintained an unlawful hiring hall through the requirement of referral slips. We need not recite the evidence showing the general practices which were also carried on by the union at other jobs. We merely recount briefly the experience of two employees—the charging party, Legg, and Spiers, another employee—in seeking employment with the Company which shows the general discriminatory scheme.

## Discrimination Against Legg and Spiers.

Legg, the charging party and a member in good standing of Local 2232, after being told by a millwright foreman the night before that work probably would be available, requested a referral slip as he was told to do from the union hall.

The foreman had called the business agent telling him to give Legg and another applicant, Spiers, a referral slip. Due to an office mixup they were not given the referral slips. Legg went to the job site and asked to see a particular foreman. The union steward came to talk to him instead and ascertained Legg had no union work order. He reprimanded Legg for soliciting work without one and threatened to report him to Local 2232. Legg complained to the superintendent of the construction project. The superintendent directed he be hired but this process was not completed that day. Legg began work the following morning. Spiers, the other employee, also a member in good standing, was refused work at the job site that day because he did not have a referral slip. The next day he obtained his slip, and Legg's, and was promptly put to work.

## The Board's Order.

The Board found the union hall referral system violated § 8(b)(2) and (1) (A). The Order requires Local 2232, the District Council, and the International to cease and desist from any employment practices or agreement and related discrimination which requires membership in or clearance by Local 2232 as a condition of employment except as authorized by § 8(a)(3) of the Act. 29 U.S.C.A. § 158(a)(3). Affirmatively, the three were required to reimburse Legg for his lost wages, and, of major importance here, to reimburse all millwrights employed by the Company the full amount of union dues and assessments collected by the Union beginning six months prior to the amended charge.[3] In addition, the

3. The Order directs Local 2232, the District Council and the International to:
"1. Cease and desist from:
"(a) Performing, maintaining, or otherwise giving effect to any employment arrangement or practice with Farnsworth & Chambers, Inc. * * * or any other employer within the territorial jurisdiction of Local 2232, over whom the Board would assert jurisdiction, which requires membership in, or clearance by Local 2232 as a condition of employment, ex-

cept as authorized by Section 8(a) (3) of the Act; and
"(b) Requiring any of their members, who are or who become employed in supervisory capacities by employers within the territorial jurisdiction of Respondent Local 2232 over whom the Board would assert jurisdiction, to hire only persons who are referred for employment by Local 2232; and
"(c) In any other manner causing or attempting to cause an employer over

Order directed the Union to post appropriate notices and report the steps taken to comply with the Board's order.

### Union Referral System Illegal.

■ There is substantial evidence to sustain the Board's finding that respondents violated § 8(b)(2) and (1)(A) by maintaining the unlawful hiring hall. The contract gives exclusive right to hire and fire millwrights to the millwright foreman. The foreman in turn was obligated to hire "none but members of the United Brotherhood." The requirement that employees secure referral slips from the Union hall was a further assurance that Union members would be preferred. It was but a further refinement of the hiring practices designed to effect a closed shop. The fact that referral slips were not given to Legg and Spiers solely by reason of an office mixup and that they could have later received them is immaterial. They were obviously delayed from beginning work solely because of the Union referral system. Jobs were not immediately available at the job sites solely because they did not have the proper work slips from the Union hall. Only Legg's persistence finally got him a job without a referral slip—after wasting one whole day in the effort. Such a hiring hall arrangement designed to prefer Union members is discrimination tending "to encourage * * * membership in [a] labor organization * *," 29 U.S.C.A. § 158(a)(3), and it is immaterial that Legg and Spiers were union members. N.L.R.B. v. Local Union No. 85, Sheet Metal Workers, 5 Cir., 1960, 274 F.2d 344; N.L.R.B. v. Philadelphia Iron Works, 3 Cir., 1954, 211 F.2d 937; N.L.R.B. v. Local 542, 3 Cir., 1958, 255 F.2d 703; N.L.R.B. v. Daboll, 9 Cir., 1954, 216 F.2d 143. See Radio Officers Union of Commercial Telegraphers Union, A. F. L. v. N.L.R.B., 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455. Indeed, the Union does not seriously deny this. Accepting this with but faint resistance, it contends that the evidence is insufficient to implicate the International in the violation. Most seriously, the Union additionally urges that the disgorgement remedy applied in the Order is, under the circumstances, inappropriate and punitive.

### International In Violation.

■ We agree with the Board that the International was responsible along with the Local and District Council for the discriminatory hiring arrangement. It is true that the International was not a signatory of the employment contract and did not, through persons unconnect-

whom the Board would assert jurisdiction to discriminate against employees or applicants for employment in violation of Section 8(a) (3) of the Act; and

"(d) In any other manner restraining or coercing employees of, or applicants for employment with, Farnsworth & Chambers, Inc. * * * or any other employer within the territorial jurisdiction of Respondent Local 2232, over whom the Board would assert jurisdiction, in the exercise of their rights guaranteed by Section 7 of the Act, except to the extent that such rights may be affected by an agreement in conformity with Section 8(a) (3) of the Act.

"2. Take the following affirmative action, which the Board finds will effectuate the policies of the Act:

"(a) Make whole W. W. Legg for any loss of pay he may have suffered as a result of the discrimination against him * * * and

"(b) Reimburse all millwrights employed by Farnsworth & Chambers, Inc. at the Phillips Chemical project in the full amount of any dues unlawfully collected from them pursuant to the Respondents' unlawful hiring arrangement or practice with Farnsworth & Chambers, Inc., provided, however, that this Order shall not be construed as requiring reimbursement for any such dues collected more than 6 months prior to the date of the amended charge herein; and

"(c) Reimburse all millwrights employed by Farnsworth & Chambers, Inc., at its Phillips Chemical project for any working assessments collected from them pursuant to the Respondents' unlawful hiring arrangement or practice with Farnsworth & Chambers, Inc., provided, however, that this Order shall not be construed as requiring reimbursement for any such assessments collected more than 6 months prior to the date of the amended charge herein * * *."

ed with Local 2232 or the District Council, actively participate in the hiring practices between the Union and the Company. However, Local 2232 was clearly carrying out the arrangement contemplated and prescribed by the Constitution and Bylaws of the International which were so designed to bring about the unlawful hiring practices. Indeed, International's Bylaws directed that "members * * * who became foremen, must comply with the union rules and hire none but members of the United Brotherhood." International's Constitution prescribes that members of the Union must conduct themselves in accordance with certain "fundamental principles, policies and objects of the organization." The Constitution provides that all locals and members are "subject to its laws and usages * * * " and that all bylaws or trade rules of local unions and district council may "in no way conflict with the Constitution and Laws of the United Brotherhood, and must be approved by the First General Vice President before becoming law * * *." The International has the sanction, among others, of taking over the government of any local union or district council whose affairs are "conducted in such a manner as to be a menace to the welfare of the International body," and of suspending any local union or district council for "willfully or directly violating the Constitution, Laws, or principles" of the International. The organic law of this union—which comprehended all of its parts including locals and district councils—committed the very existence of the subsidiary units and the economic survival of the members of the International. Under the usual legal principles governing such organizations, the International was almost the sole judge of the construction of these vague standards or the underlying facts precipitating the exertion of such sanctions. Legal relief, whatever its scope, could ordinarily come only after exhausting the internal machinery of the union. This and related factors led the Board, as it does us, to conclude that "when Local 2232 and the District Council entered into a contract with the [Company] requiring its member-employers to designate from the union millwrights, millwright union foremen and a millwright union general foreman, a situation was created in which the application of the constitutional provision requiring union foremen to hire none but members of the United Brotherhood became mandatory." Due to the International's controls, the illegal hiring practices were created. And to hold the International partially responsible is not to visit it with the sins of its offspring. For the very Bylaws of the Local and District Council setting forth the referral system to effect a closed shop were submitted and approved by the First General Vice President of the International, exactly as prescribed by International's Constitution.

Local 2232 and the District Council owed their very existence to the International. Neither had the right or power to establish a working rule or employment practice at odds with the International Constitution. On the contrary, hanging over the heads of all was the peremptory command which reflected good trade-unionism but which is now contrary to law: no foreman in a position to hire may ever hire anyone other than a man approved by the Union. Had Local 2232 or the District Council ever undertaken to modify this working rule to compel selection by the "hiring" foremen of persons without regard to union membership the contract, the working rules, and all the members associated in any way with them would have come under the strong arm of the International's constitutional power of expulsion, banishment and economic or fraternal discipline.

The International knows two things at least. One, the law now outlaws these discriminatory requirements to employment. Two, so long as the requirement remains in the Constitution, the locals and districts within its organization are compelled under the force of awesome sanctions to comply with it. It cannot ignore the existence or impact of this

formidable, and now patently illegal, constitutional command. The locals are established to make contracts in behalf of members of this union. What the local does in making contracts is what the International expects them to do. Here the contract followed the letter of the Constitution. It prescribed what the Constitution said it must prescribe. If that is not action by an authorized agency, the concept has little meaning.

Obviously, this was action by the International to "cause or attempt to cause an employer to discriminate against an employee" in order to "encourage * * membership in [a] labor organization. * * *" 29 U.S.C.A. § 158(b)(2) and (a)(3). What the statute condemns the Board may forbid.

### The Board's Remedy.

We come finally to the remedy the Board has used. We agree the cease and desist order is appropriate. We also agree that Legg, the charging party, must be reimbursed for the one day's loss caused by the referral system. However, we think the record does not support the sanction of the Board that the Union refund to all millwrights dues and assessments "unlawfully collected from them pursuant to the * * * unlawful hiring arrangement." This was limited to a specified period of not more than six months. But there is no evidence that any member paid dues or special assessments and became a member of the Union or remained a member because membership was necessary for employment with the Company as a millwright. As far as the record reveals, the members—many of them long standing members—are and will remain to be members of the Union although the hiring hall system may not be used. In the absence of some proof that the dues and assessments would not have been paid except as a requirement for obtaining employment, we think the order of restoration intended as a compensatory remedy results instead in a windfall to the employees and an unjust penalty to the Union. N.L.R.B. v. Local Union No. 85,

Sheet Metal Workers, 5 Cir., 1960, 274 F.2d 344; N.L.R.B. v. American Dredging Co., 3 Cir., 1960, 276 F.2d 286; Building Material Teamsters Local 282 v. N.L.R.B., 2 Cir., 1960, 275 F.2d 909; cf. Morrison-Knudsen Co. v. N.L.R.B., 2 Cir., 1960, 275 F.2d 914. This provision of the Order, therefore, will not be enforced. The provision of the notice regarding refunds should accordingly be modified.

Enforced in part.

JONES, Circuit Judge (dissenting).

I cannot agree that the Board's order should be enforced against the International Union. It seems to me that, to so constitute a violation of the pertinent provisions of the Labor Management Relations Act as to invoke the sanctions here imposed, an International Union must do something more in the causing or attempting to cause discrimination against employees, or the restraint or coercion of employees, than having illegal and unenforceable provisions in its constitution and by-laws. I therefore dissent.